MASSACHUSETTS COMMUNITY COLLEGE COUNCIL &
others[1] *vs.* COMMONWEALTH & others[2]
(and sixteen companion cases[3]).

Suffolk. February 7, 1995. - April 19, 1995.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Public Employment*, Mandatory furlough program, Collective bargaining. *Constitutional Law*, Contract clause. *Contract*, Employment.

Discussion of cases wherein State action was challenged on the ground that it impaired contractual obligations in violation of the Contract Clause (art. I, § 10, cl. 1) of the Constitution of the United States, and statement of principles applicable to analysis of such cases as set forth in *United States Trust Co.* v. *New Jersey*, 431 U.S. 1 (1977). [130-137]

A furlough program applicable to certain State employees, mandated by St. 1991, c. 6, § 90 (*b*) and (*c*), substantially impaired the Commonwealth's obligation to pay compensation to those employees pursuant to applicable collective bargaining agreements, and the Commonwealth did not demonstrate that the impairment was necessary and reasonable, in the circumstances, to serve an important public purpose. [131-132, 134, 137-141]

---

[1]Faculty and various professional staff at several of the Commonwealth's community colleges.

[2]The Governor; the Secretary of Administration and Finance; the Chancellor of the system of public institutions of higher education; and the members of the Board of Regents of Higher Education (now the Board of Trustees of the University of Massachusetts).

[3]Eight similar actions brought by other unions representing employees in the State college system. The defendants in these actions are the same in each case for all practical purposes and shall be referred to as the Commonwealth. The names of the other unions are not important to the issues. We shall refer to them collectively as the unions.

The Commonwealth brought actions against all but one of the nine unions, seeking to vacate arbitration awards. The issues before us are the same in all these actions.

CIVIL ACTIONS commenced in the Superior Court Department, seven on April 5, 1991; one on April 8, 1991; one on April 9, 1991; one on November 14, 1991; three on November 19, 1991; two on December 18, 1991; one on March 10, 1992; and one on April 30, 1992.

The cases were heard by *Hiller B. Zobel*, J., on a statement of agreed facts.

The Supreme Judicial Court granted an application for direct appellate review.

*Scott M. Davis*, Assistant Attorney General (*Judith Fabricant*, Assistant Attorney General, with him) for the Commonwealth & others.

*Sandra C. Quinn* for the plaintiffs.

WILKINS, J. The cases before us, consolidated for trial in the Superior Court, concern the Commonwealth's 1991 mandatory furlough program for certain State employees, adopted, pursuant to St. 1991, c. 6, § 90, in the face of a perceived fiscal crisis.

The unions commenced actions challenging the constitutionality of the furlough program, largely on the basis that the program abrogated the compensation provisions of various collective bargaining agreements, thereby violating the Contract Clause (art. I, § 10, cl. 1) of the Constitution of the United States ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts").[4] A Superior Court judge ordered to arbitration the question whether the imple-

---

[4]The unions also raised claims of the denial of due process of law under both the Fourteenth Amendment to the Constitution of the United States and art. 10 of the Massachusetts Declaration of Rights. In *Opinion of the Justices*, 364 Mass. 847 (1973), the Justices viewed the State retirement program as extending protected rights to State employee participants with respect to any increase in their obligation to make contributions. Their rights were said to be "under the shelter of the impairment-of-contract clause, or what amounts to much the same thing, the due process clause of the Federal Constitution and State constitutional provisions cognate to the latter" (footnote omitted). *Id.* at 863. As will be seen, because of changes in the Supreme Court's view of the Contract Clause, due process considerations may no longer parallel considerations under the Contract Clause. The unions have made no separate argument that their members' rights are any greater under art. 10 than under the Contract Clause, nor do they

mentation of the furlough program violated the collective bargaining agreements, and, in each case, the arbitrator determined that the furlough program violated the applicable collective bargaining agreement but made no ruling on the precise remedy. The Commonwealth then brought actions, pursuant to G. L. c. 150C, § 11 (1992 ed.), seeking to vacate the respective arbitration awards on the ground that the implementation of any remedy would require the Commonwealth to violate the terms of the furlough statute.

The parties entered into a statement of agreed facts covering almost all relevant factual matters, and a Superior Court judge heard evidence on two disputed factual issues. On February 16, 1994, the judge issued a memorandum and order in which he answered in the affirmative the question whether "[i]n the face of a valid collective bargaining agreement, does a public employer violate the constitutional prohibition against impairing contracts, U.S. Const., art. I, § 10, cl. 1 when, to meet a budget deficit, it mandates unpaid 'furloughs' for covered employees?" His position was that under no circumstances could the Commonwealth justify its action. He, therefore, saw no need to resolve the disputed factual issues.[5] Although we agree that the implementation of the

---

argue that the relevant considerations under art. 10 are any different than those that we apply under the Contract Clause.

[5]The judge gave the following reasons for his ruling:

"If for whatever reason, the Commonwealth's coffers are not sufficiently full to meet its obligations, it must raise the wherewithal in the usual way. Unless the contract permits, it may not temporarily lay off employees who are contractually entitled to work and to be paid for their labor.

"This court regards as irrelevant the argument, vigorously pressed . . . that imposition of additional taxes was not 'a realistic or feasible option.' Finding the funds to meet its contractual obligations was entirely and exclusively the employer's problem, which it could not shift onto the employees by unilaterally withholding bargained-for pay.

"Nor could the employer treat the mandatory furlough as merely a deferral of compensation. Deferring compensation at best constitutes an exacted loan; at worst, it is a direct taking. In either event, if, as here, the program violates a collective bargaining agreement, it is impermissible."

furlough program impaired the Commonwealth's obligations in violation of the Contract Clause, Contract Clause principles are not as absolute as the trial judge stated. See *United States Trust Co.* v. *New Jersey*, 431 U.S. 1 (1977).

After describing the furlough program, we shall analyze principles applicable under the Contract Clause that are set forth in *United States Trust Co.* v. *New Jersey, supra*, an opinion that gave that clause new life. See L.H. Tribe, American Constitutional Law § 9-11, at 619-620 (2d ed. 1988). All parties agree that the principles of the *United States Trust Co.* case provide the standards for the case before us, although they disagree concerning the consequences of the application of those principles. We shall conclude that the implementation of the furlough plan was a substantial impairment of the rights of the affected employees and that no circumstances of the sort that would justify such an impairment exist in this case.

On March 22, 1991, St. 1991, c. 6, § 90, was enacted providing "as a matter of paramount public policy, during this period of fiscal exigency . . . a temporary program of furloughs for employees and officers" of the Commonwealth. The Legislature found that a temporary program of furloughs "is the least painful means of conserving and utilizing the commonwealth's available monies during this extraordinary period of fiscal constraint while permitting the continuation, without any interruption, of the provisions of vital services." § 90 (*a*). Section 90 (*b*) provided that the furlough program would be implemented, if, as of April 7, 1991, the Secretary of Administration and Finance (secretary)[6] estimated that revenues for the 1991 fiscal year (ending June 30, 1991), would be insufficient to meet the expenditures author-

---

[6]The statute directs that the estimate to be made-by the "commissioner of administration, pursuant to [G. L. c. 29, § 5B]." St. 1991, c. 6, § 90 (*b*). General Laws c. 29, § 1 (1992 ed.), incorporates by reference the definition of "commissioner" that appears in G. L. c. 7, § 4 (1992 ed.): "The governor shall appoint a commissioner of administration who shall serve . . . as the secretary of administration." We shall refer to the commissioner as the secretary, as the parties have done.

ized and anticipated in that fiscal year.[7] The secretary estimated that 1991 fiscal year revenues would be insufficient to meet 1991 fiscal year expenditures. The program was implemented, effective April 14, 1991.

The furlough program was mandated to apply to every State employee annually earning $20,000 or more, except judges. St. 1991, c. 6, § 90 (*b*) and (*c*).[8] Each employee was given the option of electing one of three choices, to be carried out between April 14, 1991, and June 30, 1991: (1) to take unpaid days off, unless the Governor designated the employee as a "critical and essential" employee, (2) to work without pay and receive bonus paid vacation days to be available after the beginning of the next fiscal year, or (3) to work without pay and receive a lump sum payment when his or her State employment terminated. St. 1991, c. 6, § 90 (*b*), (*c*), and (*d*). For each affected employee the number of mandated furlough days depended on the employee's level of compensation. St. 1991, c. 6, § 90 (*c*). An employee annually earning between $20,000 and $24,999 was to be furloughed for two days. *Id.* The mandated furlough days increased in steps to fifteen mandated days for any employee whose annual compensation was $70,000 or more. *Id.* The furlough program did not impair seniority rights or other employee benefits. St. 1991, c. 6, § 90 (*g*).

In *United States Trust Co.* v. *New Jersey, supra,* the Court held invalid under the Contract Clause an attempt by 1974 statutes to repeal a 1962 statutory covenant that had pledged certain revenues and reserves as security for bonds issued by the Port Authority of New York and New Jersey. Because the States' self-interest was at stake in that case, the Court determined that there was a need for heightened judicial oversight, a stricter scrutiny of abrogations of government obligations than in the case of legislative interference

---

[7]That estimate of revenues and expenditures was to be made pursuant to G. L. c. 29, § 5B (1992 ed.), which contains certain directions concerning the making of estimates, particularly of revenues. St. 1991, c. 6, § 90 (*b*).

[8]It also applied to public authorities of the Commonwealth and to consultant and service contracts.

with the contracts of private parties. *Id.* at 25-26. See *Keystone Bituminous Coal Ass'n* v. *DeBenedictis*, 480 U.S. 470, 505 (1987); *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, 459 U.S. 400, 412-413 & n.14 (1983).

The first consideration under the Contract Clause is whether subsequent State action has in fact impaired any enforceable contractual obligation. See *United States Trust Co.* v. *New Jersey, supra* at 17. The Commonwealth, however, does not challenge the enforceability of the compensation provisions of the collective bargaining agreements, apart from the effect of the furlough program. It makes no claim that, because the Legislature had some non-delegable power to regulate future compensation in the circumstances of this case, the bargained-for compensation was not binding for services to be rendered after the effective date of the furlough program. See *id.* at 23. The collective bargaining agreements were entered into in the latter part of December, 1990, during the fiscal year in which the statute prescribing the furlough program was enacted and the program was implemented. There is no suggestion that the Legislature had not appropriated funds to pay the compensation called for under the collective bargaining agreements. Indeed, the furlough program was designed to generate revenue surpluses that would be available at the end of the fiscal year to help balance the budget.

Not every impairment of a State's contractual obligation violates the Contract Clause. *Id.* at 21. The clause is not to be read literally to proscribe all impairments. *Home Bldg. & Loan Ass'n* v. *Blaisdell*, 290 U.S. 398, 428-429 (1934). The inquiry is whether the impairment is substantial. See *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co., supra* at 411.

The mandatory furlough program substantially impaired the Commonwealth's obligation to pay compensation to the various affected employees covered by the collective bargaining agreements. Opinions dealing with mandatory State furlough or delayed compensation plans, although not unanimous on other points, have agreed that a unilateral reduction

in contractually established, future State employee salary obligations constitutes a substantial impairment for Contract Clause purposes. See *Baltimore Teachers Union* v. *Mayor of Baltimore*, 6 F.3d 1012, 1018 & n.8 (4th Cir. 1993)("[w]e would be reluctant to hold that any decrease in an annual salary beyond one that could fairly be termed *de minimis* could be considered insubstantial"; annual salary reduction of .95% not insubstantial), cert. denied, 510 U.S. 1012 (1994); *Condell* v. *Bress*, 983 F.2d 415, 419 (2d Cir.), cert. denied, 507 U.S. 1032 (1993); *Association of Surrogates & Supreme Court Reporters* v. *New York*, 940 F.2d 766, 772 (2d Cir. 1991), cert. denied, 502 U.S. 1058 (1992); *Opinion of the Justices (Furlough)*, 135 N.H. 625, 634 (1992); *Association of Surrogates & Supreme Court Reporters* v. *State*, 79 N.Y.2d 39, 46-47 (1992); *Carlstrom* v. *State*, 103 Wash. 2d 391, 395 (1985).

The Commonwealth seeks to minimize the substantiality of its failure to comply with its contractual obligations by pointing to the consequences of St. 1991, c. 499, §§ 14 and 15, enacted on December 31, 1991. Under § 14 (*a*), all persons who were subject to the furlough law and elected to work without compensation during their furlough days were reimbursed for their lost salary by January 31, 1992. Employees who elected to work and receive bonus vacation days and had not used all those days could obtain a lump sum payment for those days. § 14 (*b*). Employees who had used bonus vacation days prior to the implementation of St. 1991, c. 499, §§ 14 and 15, were not reimbursed for the bonus vacation days that they had used. Although the remedial provisions of the 1991 legislation may affect the relief to which certain employees may be entitled in arbitration, those provisions cannot be relied on in deciding whether the Commonwealth was in substantial breach of its obligations.

"The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations. As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose." (Footnote omit-

ted). *United States Trust Co.* v. *New Jersey, supra* at 25. As we have said, when the State's self-interest is involved, complete deference to the Legislature's assessment of reasonableness and necessity is not appropriate. *Id.* at 25-26. We have a constitutional duty to reach our own conclusion on such issues. The trial judge, however, made no explicit determination of reasonableness or of necessity, concluding, in effect, as we interpret his position, that, where the option of increasing taxes exists, an impairment of contract of the type involved here can never be reasonable or necessary. Because the statement of agreed facts adequately provides a basis for passing on those questions, we shall undertake the task ourselves.

Once a substantial impairment of a contract has been shown, the State has the burden of demonstrating that the impairment was both reasonable and necessary to serve an important State purpose. *United States Trust Co.* v. *New Jersey, supra* at 31. In doing so, the State is aided by the limited deference, of a somewhat undefined scope, owed to the Legislature's judgment that a contractual obligation must be impaired. *Id.* at 26. See *Local Div. 589, Amalgamated Transit Union* v. *Massachusetts,* 666 F.2d 618, 643 (1st Cir. 1981), cert. denied, 457 U.S. 1117 (1982).

The extent of any impairment is a factor in determining its reasonableness (*United States Trust Co.* v. *New Jersey, supra* at 27), as is the importance of the public purpose to be served (*id.* at 29). An impairment is not a reasonable one if the problem sought to be resolved by an impairment of a contract existed at the time the contractual obligation was incurred. *Id.* at 32. If the foreseen problem has changed between the time of the contracting and the time of the attempted impairment, but has changed only in degree and not in kind, the impairment is not reasonable. *Id.* See *Carlstrom* v: *State,* 103 Wash. 2d 391, 397 (1985) ("The United States Supreme Court has observed that if the state is aware of problems when it enters into a contract, the state cannot impair those contracts on the basis of problems that have only changed in degree rather than in kind"); *Baltimore Teachers*

*Union* v. *Mayor of Baltimore*, 6 F.3d 1012, 1021 n.13 (4th Cir. 1993) ("To the extent the City was aware of its precarious financial condition and of possible reductions in state aid when it enacted its budget, however, we believe that the magnitude of the reductions in state aid rendered the budgetary shortfall that gave rise to the salary reductions tantamount to a difference in kind from one the City might otherwise have anticipated"). Thus, if there was a foreseen budget crisis in December, 1990, when the collective bargaining agreements were signed, the budget crisis seen on or about April 7, 1991 (when the furlough program was triggered), can be a reasonable basis for the impairment only if the difference in the Commonwealth's foreseen financial problems at the two times was more than one of degree. It is by application of this test of reasonableness that the Commonwealth's case fails.

If there were an available, more moderate course that would have served the State's important purposes equally as well, an impairment would not be a necessary one. *United States Trust Co.* v. *New Jersey, supra* at 31. "[A] State is not completely free to consider impairing the obligation of its own contracts on a par with other policy alternatives." *Id.* at 30-31. Thus, if there was an alternative or alternatives available to achieve the same beneficial effect on the 1991 fiscal year results as the furlough program, the impairment was not necessary. If the State interest is not vital, an impairment will not be necessary. *Id.* We need not decide the necessity question because the furlough program fails the reasonableness test.

Various other jurisdictions have considered the Contract Clause in relation to legislative attempts to abrogate bargained-for compensation for State employees. In all but the *Baltimore Teachers Union* case, the principles of the Contract Clause have been said to bar the impairment.[9] In *Opin-*

---

[9]The weight of authority is supported by *Chiles* v. *United Faculty*, 615 So. 2d 671, 673 (Fla. 1993) (legislative abrogation of funded and collectively bargained pay raises for State employees impaired obligation of con-

*ion of the Justices (Furlough)*, 135 N.H. 625 (1992), the Justices answered questions concerning a proposed State law that would establish a program requiring State employees to take days of unpaid leave. As to State employees having rights under collective bargaining agreements, the Justices stated that the bill, if enacted, would violate the Contract Clause. *Id.* at 629. The Justices rejected, as an adequate justification for the impairment, the argument that the public interest in fiscal stability at the least cost to the operation of State government and its employees was sufficient to justify any impairment of contract. *Id.* at 635. The bill, the Justices said, was neither reasonable nor necessary to serve an important public purpose. *Id.* at 636. "The legislature has many alternatives available to it, including reducing non-contractual State services and raising taxes and fees. Although neither of these choices may be as politically feasible as the furlough program, the State cannot resort to contract violations to solve its financial problems." *Id.*

Recently, the Court of Appeals of New York and the United States Court of Appeals for the Second Circuit have held that New York State salary deferral programs, commonly called "lag payroll" programs, violated the Contract Clause. See *Association of Surrogates & Supreme Court Reporters v. State*, 79 N.Y.2d 39 (1991); *Association of Surrogates & Supreme Court Reporters v. New York*, 940 F.2d 766 (2d Cir. 1991), cert. denied, 502 U.S. 1058 (1992); *Condell v. Bress*, 983 F.2d 415 (2d Cir.), cert. denied, 507 U.S. 1032 (1993). In each case the principal question was whether the "lag payroll" measure was reasonable and necessary notwithstanding the availability of other alternatives. *Id.* at 419-420. In each case the answer was that it was not. The New York Court of Appeals indicated that the choices in a fiscal crisis did "not include impairing contract rights to obtain forced loans to the State from its employees." *Association of Surrogates*, 79 N.Y.2d at 47. The Second Circuit

tract under Florida Constitution, relying on principles stated in *United States Trust Co. v. New Jersey*).

Court of Appeals took the more limited view that the fiscal crises were not so severe as to justify the impairment. *Condell* v. *Bress, supra* at 420. It is significant that the courts struck down a State's attempt at budget balancing which involved only a delay in salary payments, and not, as in our case, the total elimination of certain compensation.

In *Carlstrom* v. *State*, 103 Wash. 2d 391 (1985), the court held that a declared financial emergency did not justify the State's legislatively authorized refusal to implement bargained-for salary increases for certain State employees. The court concluded that the State's acts were not reasonable because the State's economic emergency was expected and foreseeable when it entered into the employment contracts. *Id.* at 397 ("Since the State was fully aware of its financial problems while negotiating and prior to signing the Agreement, it cannot now be permitted to avoid the Agreement based on those same economic circumstances. Although the financial situation worsened, it was a change in degree, not in kind"). The court did not need to reach the question of necessity.

The only exception to the judicial rejection of State attempts to back out of obligations to pay future compensation to its employees pursuant to collective bargaining agreements appears in *Baltimore Teachers Union* v. *Mayor of Baltimore*, 6 F.3d 1012 (4th Cir. 1993). The court accepted the city's furlough program as reasonable and necessary. The court acknowledged that, when the government's self-interest is at stake, judicial scrutiny must be more intense than when private contracts are involved. *Id.* at 1019. However, the opinion granted substantial deference to the city's judgment, as if it were dealing with the impairment of private contracts, and exercised little independent judgment on the reasonableness or necessity of the city's action. The opinion has been criticized for these reasons. See *Baltimore Teachers Union* v. *Mayor of Baltimore: Does the Contract Clause Have Any Vitality in the Fourth Circuit?*, 72 N.C.L. Rev. 1633, 1644-1648 (1994) ("The Fourth Circuit's misapplication of *United States Trust* cannot be explained by compel-

ling factual differences because *Baltimore Teachers Union* presents an even stronger case for the application of the Contract Clause than did *United States Trust*"). Note, Fourth Circuit Upholds City's Payroll Reduction Plan as a Reasonable and Necessary Impairment of Public Contract, 107 Harv. L. Rev. 949, 949 (1994) ("[T]he court misapplied Supreme Court precedent and undermined the protection of the economic rights of parties to public contracts").[10]

In determining the reasonableness of and the necessity for the Commonwealth's substantial impairment of the affected State employees' contractual rights, we must consider the circumstances that existed in April, 1991, when the furlough program became effective following the determination of the secretary that the 1991 fiscal year would terminate with a deficit.[11] The circumstances in the latter part of December, 1990, when the collective bargaining agreements were executed, are also important because, if the Commonwealth's fiscal situation did not change in kind, but only in degree, between December and April, the implementation of the furlough program was not reasonable for purposes of the Contract Clause. *United States Trust Co.* v. *New Jersey, supra* at 31-32.

In November, 1990, the prior administration had estimated that the 1991 fiscal year would end in a deficit of approximately $107 million. During the previous fiscal year (1990), the credit rating of the Commonwealth's general obligation bonds by Moody's Investment Service and Standard and Poor's had been reduced to their lowest investment-grade level ratings, the lowest of any State in the nation. During

---

[10]We attribute significance neither to the denial of certiorari in the *Baltimore Teachers Union* case nor to the denial of certiorari in the 1991 and 1993 cases in the United States Court of Appeals for the Second Circuit, cited earlier, concerning unsuccessful attempts by the State of New York to delay certain bargained-for compensation payments to its employees.

[11]We shall focus on circumstances existing on April 7, the date as of which the secretary had the duty to make a determination of the deficit. Because, by statute (St. 1991, c. 6, § 90 [*c*]), no impairment was to occur until April 14 at the earliest, the appropriate date for determining the reasonableness and necessity of the impairment may well be April 14.

the 1991 fiscal year, the Commonwealth's credit rating did not change. In July, 1990, sales, income, and gasoline taxes had been increased and were projected to generate $1.125 billion in additional revenue in the 1991 fiscal year. The State had borrowed $1.344 billion in the fall of 1990 to finance the deficit in the 1990 fiscal year. Under G. L. c. 29, § 9C, in September, 1990, the then Governor had ordered $464 million in spending cuts in the executive branch.

In January, 1991, the new secretary concluded that the 1991 deficit would be greater than previously indicated, both because of a decline in revenues and an increase in State spending, primarily in programs such as Medicaid. In mid-January, the new Commissioner of Revenue advised the new secretary that a weak economy indicated that 1991 revenue receipts had to be revised downward and that a downward trend in estimated revenues had been in effect during the latter part of 1990.

In February, 1991, the secretary reported to the Governor that the Commonwealth faced a deficit for the 1991 fiscal year of $850 million.[12] The secretary's estimate of a deficit of $850 million included certain items (over $80 million), such as pay raises, that were never implemented. On February 5, 1991, the Governor ordered the withholding of further allotments of authorized expenditures. By April 1, about $200 million in expenditure reductions had been achieved for the 1991 fiscal year. The Governor did not consider or propose any tax increase to reduce the deficit. Indeed, on the Gover-

[12]Some of the difference (over $100 million) between this estimate and the November, 1990, estimate of the prior administration is attributable to different judgments about particular items of anticipated revenue or receipts and not to changes in the basic data. Indeed, because the facts on which opinions about the deficit are based are more important for our purposes than the opinions themselves, the record should have contained more data than it did about the circumstances on which the prior administration's estimate of a deficit was based. We do know that in mid-October, 1990, the Bureau of Analysis, Estimation and Research within the Department of Revenue reduced its estimated 1991 fiscal year revenue forecast by $155 million, but the commissioner did not adopt the reduced forecast. Optimism or pessimism about future revenue receipts appears to be a factor in the different predictions (November, 1990 versus April, 1991).

nor's urging, the Legislature repealed a sales tax on services in March, 1991, that had been estimated to produce about $50 million in revenue in fiscal year 1991. St. 1991, c. 4.

When the furlough program was authorized on March 22, 1991 (St. 1991, c. 6, § 90), it was estimated that, if implemented, it would reduce 1991 fiscal year spending by approximately $72 million, of which about $50 million was attributable to State employees. The record does not disclose what portion of the reduction was attributable to State employees whose compensation was determined pursuant to collective bargaining agreements. Other fiscal measures enacted in St. 1991, c. 6, were estimated to reduce the 1991 fiscal year deficit by approximately $69 million, and similar fiscal measures in St. 1991, c. 5, would reduce the deficit by another $134 million. In March, 1991, the Legislature declined to enact various programs that the Governor recommended having a deficit reduction value of $176 million.

After reflecting the effect of all these matters, the secretary estimated as of March 29, 1991, that the 1991 fiscal year would produce a deficit of approximately $265 million. The secretary did not make another estimate as of April 7, 1991, the date for the implementation of the furlough program (if, as he did, the secretary projected a 1991 fiscal year deficit on that date). The absence of an estimate based on information available on April 7, 1991, may be significant because between March 22 and April 7, information became available that indicated that the Federal government's 1991 fiscal year reimbursement for Medicaid would likely be $146 million greater than the figure used in estimating the $265 million 1991 fiscal year deficit.

The statement of agreed facts sets forth the following conclusion: "[T]he Secretary of Administration and Finance concluded that any substantial reductions in state expenditures would significantly affect state employees. If the furlough plan had not been implemented, Administration and Finance at that time was aware of few other options to reduce spending in the few months remaining in Fiscal 1991, and projected that it would be highly likely that further lay-

offs, or a 'shutdown' of state government, would have had to have been implemented to attempt to achieve the necessary spending reductions by June 30, 1991."

The statement of agreed facts also includes the following conclusion of the secretary concerning the furlough program: "Administration and Finance was of the opinion that the furlough program would provide a certain, predictable and substantial reduction in spending in Fiscal 1991, without any significant disruption of state services. By comparison, Administration and Finance projected that it would take a shutdown of all non-critical state services for a period exceeding three weeks to realize savings comparable to those provided in the furlough program. The Secretary of Administration and Finance projected that an additional layoff of 1,000 state employees, for example, would yield savings of no more than $5 million in Fiscal 1991 . . . because . . . employees are often owed money when they leave state service (e.g. for unused vacation time and, in some cases, unused sick days) and that therefore a layoff often does not provide net short-term savings to the Commonwealth."

Events occurring after April 7, 1991, that were not reasonably foreseeable are not appropriate to our analysis. To complete the circumstances of the 1991 fiscal year, we note that the level of Medicaid reimbursement increased substantially beyond the estimate made in early April, 1991. By May 15, 1991, the Commonwealth projected a surplus for the 1991 fiscal year of $28.5 million, and in fact ended the year with a surplus of $237 million.

We conclude that the Commonwealth was confronted with an increasing 1991 fiscal year deficit throughout the period from December, 1990, through April 7, 1991. The fiscal problems of March and April, 1991, were reasonably foreseeable when the collective bargaining agreements were signed. The Commonwealth was in financial difficulty in December, 1990, but nevertheless entered into the collective bargaining agreements. Any difference in the circumstances in effect in April, 1991, was a difference in degree and not a difference in kind. In those circumstances, the substantial impairment

of State employees' rights under collective bargaining agreements cannot be justified as reasonable.

The judgment of the Superior Court is vacated,[18] and a new judgment shall be entered declaring that the implementation of the furlough program pursuant to St. 1991, c. 6, § 90, impaired the obligation of the Commonwealth to pay compensation pursuant to the respective collective bargaining agreements, in violation of art. I, § 10, cl. 1, of the United States Constitution.

*So ordered.*

---

[18]The judgment as entered declared St. 1991, c. 6, § 90, facially invalid, a position we do not accept, and declared that art. 10 of the Massachusetts Declaration of Rights was violated, on its face and as applied, issues we do not decide.