Opinión disidente emitida por el
Juez Asociado Señor Kolthoff Caraballo.

Salary and pensions are not synonymous.

(1)

Si usted tuviera 30 años de edad y le anunciaran que a los 40 indefectiblemente va a morir, ¿invertiría sus últimos *846 10 años de vida aportando a un plan de retiro? ¡Claro que no! ¿Para qué?, si usted jamás alcanzará la edad de retiro. Pues algo parecido es lo que el Estado ha provocado con la aprobación de la Ley Núm. 3-2013. Un análisis profundo y a conciencia me lleva irremediablemente a concluir que, en lo que respecta a la dramática reducción de las anualidades que impone, esta ley ha convertido al Sistema de Re-tiro de los Empleados del Gobierno de Puerto Rico en un particular oxímoron: obliga al empleado público a aportar a un plan de retiro con el cual jamás podrá retirarse. Es una contradicción de términos, porque los “planes de retiro” son precisamente para poder “retirarse”.
Cuando a un empleado que ha aportado a su plan de retiro por espacio de 20, 23, 25, 30 o más años de honroso servicio público, se le anuncia que cuando finalmente alcance su edad de retiro recibirá, en lugar de una pensión acordada equivalente al 75% o 65% de su salario, una pensión de apenas 40%, 35% o hasta el 30%, ese empleado sabe que realmente no se podrá retirar. De manera que, además de que tendrá que aportar por más tiempo y en mayor cantidad a su “plan de retiro”, al final esta persona tendrá que continuar trabajando, ya sea en la posición que ocupa en el servicio público o buscar otro empleo a tiempo completo en la empresa privada.(2) Tal grado de menoscabo contractual hace necesaria una intervención de esta Curia, que no puede relegarse en aras de la autolimitación o no intervención con los poderes de las otras dos ramas de gobierno.
Ciertamente, este Tribunal está impedido de dictaminar la forma y manera en que las ramas hermanas de gobierno deben resolver un problema de política pública. Eso, claramente constituiría una intromisión indebida en sus poderes, pues al Tribunal Supremo no le corresponde legislar o *847 establecer cuál ha de ser la política pública del país. No nos corresponde gobernar.
Sin embargo, en circunstancias como las de los casos de autos, estamos obligados a impedir o al menos mitigar cualquier acción de las ramas políticas dirigida a menoscabar sustancial y permanentemente los derechos adquiridos de los ciudadanos. Sobre todo, cuando tal menoscabo es tan sustancial y de tal naturaleza que no cumple con el grado de razonabilidad que exige el escrutinio racional que en el pasado hemos utilizado en estatutos socioeconómicos. Los casos de autos son claramente distinguibles de Domínguez Castro et al. v. E.L.A. I, 178 DPR 1 (2010), cert. denegado, Domínguez Castro v. Puerto Rico, 131 S.Ct. 152 (2010). En esta ocasión, el interés propietario de los empleados públicos así como la violación de sus derechos adquiridos son sustancialmente distintos en gravedad y naturaleza.
Soy consciente —como debemos serlo todos— de que el Gobierno se encuentra en una extremadamente difícil situación financiera. Sin embargo, pienso que si el barco está haciendo agua y existe la amenaza real de un naufragio, se lanzan por la borda primeramente las bagatelas. Luego, si es necesario, las cosas importantes y finalmente las cosas más valiosas. Para cualquier persona trabajadora la pensión por la cual ha trabajado toda su vida constituye su seguridad y posesión más valiosa. Por eso, y aunque estoy impedido de identificarlas, veo claramente muchas “bagatelas fiscales” y múltiples “cosas importantes” que precisarían ser arrojadas por la borda, antes que las valiosas pensiones de decenas de miles de nuestros empleados públicos.
I

La sentencia del Tribunal de Primera Instancia en el contexto de la Regla 10.2 de Procedimiento Civil

En los casos de autos no procedía la desestimación de las causas presentadas por los demandantes, pues no se cumplió con la jurisprudencia interpretativa de la Regla *848 10.2 de Procedimiento Civil.(3) Contrario a lo resuelto por el Tribunal de Primera Instancia, las alegaciones de las demandas no dejaban de exponer una reclamación que justificara la concesión de un remedio. Me explico.
Sabido es que la Regla 10.2 de Procedimiento Civil, supra, concede el que un demandado presente una moción de desestimación contra cualquier alegación hecha en el cuerpo de una demanda. Sin embargo, tal desestimación procederá solo si “es evidente de las alegaciones de la demanda que algunas de las defensas afirmativas prosperará”. (Enfasis suplido).(4) Del mismo modo, en diversas ocasiones hemos expresado que ante una moción de desestimación las alegaciones hechas en la demanda tienen que ser interpretadas en conjunto, liberalmente y de la manera más favorable posible para la parte demandante.(5) Además, al resolver una moción de desestimación fundamentada en la Regla 10.2 de Procedimiento Civil, supra, el tribunal tiene la obligación de dar por ciertos y buenos todos los hechos bien alegados por el demandante.(6) Por último, y específicamente al evaluar la defensa de si la demanda deja de exponer una reclamación que justifique la concesión de un remedio, el tribunal deberá “determinar si a base de éstos [hechos] la demanda establece una reclamación plausible que justifique que el demandante tiene derecho a un remedio, guiado en su análisis por la experiencia y el sentido común”.(7)
En los casos de autos, los demandantes expusieron claramente en sus alegaciones no solo un menoscabo sustancial y permanente en sus pensiones, sino que especificaron y detallaron el grado de ese menoscabo, sobre todo con re *849 lación a la cantidad en que se verían reducidas sus anualidades futuras. Sin embargo, y sin explicación aparente, el Tribunal de Primera Instancia obvió tales alegaciones. Conforme lo requiere la Regla 10.2 de Procedimiento Civil, supra, el foro de primera instancia debió —y podía con razonable facilidad— determinar que con la aprobación de la Ley Núm. 3-2013 todos los demandantes sufrirán al momento de su retiro una reducción promedio en sus pensiones de entre 30% a 45%. De esta forma, y guiado por un análisis racional y objetivo, el Tribunal de Primera Instancia hubiera tenido que concluir que tal reducción en las anualidades de los demandantes constituye un menoscabo no solo sustancial y permanente, sino demasiado drástico en comparación con la pensión que el Estado acordó que les honraría, a cambio de sus constantes aportaciones. United Auto., Aerospace, Agr. Implement Workers of America Intern. Union v. Fortuño, 633 F.3d 37, 45-46 (1er Cir. 2011). De manera que los demandantes alegaron claramente la forma, extensión y severidad en las que la Ley Núm. 3-2013 socavaba sus expectativas contractuales. Id.
Por otro lado, de las alegaciones de los demandantes también surgía claramente que estos expusieron alternativas no contempladas en la Exposición de Motivos ni en el resto del cuerpo de la Ley Núm. 3-2013, que constituían opciones más moderadas y que, al menos de su faz, parecerían viables para sustituir y así cuando menos mitigar el menoscabo a sus pensiones.(8) Como surge del texto de la propia Ley Núm. 3-2013, las enmiendas que esta establece tienen el propósito de “en conjunto [...] reducir [...] el déficit actuarial del Sistema [de Retiro y] el déficit de caja”,(9) y no de solventar el déficit total de la agencia. (Enfasis suplido). Por lo tanto, las distintas alternativas propuestas por los demandantes no debían evaluarse como un remedio *850 total o una cornucopia a los problemas de la agencia, sino como un paliativo que podría sustituir parte de los ingresos que el Gobierno busca al menoscabar las pensiones de los demandantes. En síntesis, no es esencial el que se implanten todas las enmiendas aprobadas por la Ley Núm. 3-2013. Es posible identificar aquellas más drásticas al menoscabo de las pensiones de los servidores públicos y sustituirlas por alguna de las alternativas propuestas por los propios demandantes. U.S. Trust Co. of New York v. New Jersey, 431 US 1, 29-30 (1977) {“The determination of necessity can be considered on two levels. First, it cannot be said that total repeal of the covenant was essential; a less drastic modification would have permitted the contemplated plan without entirely removing the covenant’s limitations on the use of Port Authority revenues and reserves to subsidize commuter railroads”). (Enfasis suplido).
Por otro lado, en casos en los que se cuestiona la constitucionalidad de una ley por el menoscabo de obligaciones contractuales, el primer paso es determinar si la ley en cuestión ha provocado un menoscabo substancial del contrato entre las partes. De determinarse la existencia de un menoscabo substancial, entonces procede en segundo término determinar si tal menoscabo es razonable y necesario para conseguir un propósito importante para el Estado.(10) Ahora bien, cuando el Estado es una de las partes en tal contratación, nuestro escrutinio debe ser más riguroso, otorgándole menos deferencia a la acción legislativa en el análisis de razonabilidad y necesidad. U.S. Trust Co. of New York v. New Jersey, supra, pág. 26 (“complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State’s self-interest is at stake”). (Énfasis suplido).
En la evaluación de una moción de desestimación según la Regla 10.2 de Procedimiento Civil, supra, fundamentada en que la parte demandante dejó de exponer una causa de *851 acción que amerite la concesión de un remedio, ninguna de las partes tiene que presentar prueba. Sin embargo, y como señalamos, lo que sí es necesario determinar es si los hechos alegados en la demanda establecen de su faz una reclamación que sea plausible y que, como tal, justifique que el demandante tiene derecho al remedio que busca o, al menos, a parte de este. Si se determina que los hechos alegados “no cumple [n] con el estándar de plausibilidad, el tribunal debe desestimar la demanda”.(11) Lo que se busca con el análisis de plausibilidad es el “no permitir que una demanda insuficiente proceda bajo el pretexto de que con el descubrimiento de prueba pueden probarse las alegaciones conclusorias”.(12)
Me parece evidente que en los casos de autos, las alegaciones de los demandantes eran claras y suficientes en el aspecto del drástico menoscabo producido por la Ley Núm. 3-2013, sobre todo en lo concerniente al Art. 5-103(6)(iii-iv) de la ley, que establece la dramática reducción de sus anualidades futuras. Asimismo, me parece que las alegaciones son plausibles en el aspecto de la viabilidad de opciones más moderadas para sustituir y cuando menos mitigar el menoscabo a las pensiones de los demandantes. Además, en sus alegaciones los demandantes enumeraron distintas alternativas que se le presentaron a la Asamblea Legislativa, de las cuales no surge de la exposición de motivos de la ley que alguna fuera considerada. U.S. Trust Co. of New York v. New Jersey, supra, págs. 30-31 (“[A] State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives”). (Énfasis suplido).
Por todo lo anterior, me parece que —al analizar las alegaciones de las demandas— el Tribunal de Primera Instancia no podía concluir que era evidente que los deman *852 dantes no tenían una reclamación que justificara la concesión de un remedio. En este contexto y en casos como los de autos, son lapidarias las expresiones del Dr. José A. Cuevas Segarra:
En aquellos casos en los que esté involucrado un alto interés público, no debe desestimarse ninguna acción bajo la Regla 10.2 de Procedimiento Civil, por insuficiencia de las alegaciones, salvo en aquellas ocasiones en que no quepa duda que bajo ninguna situación de hechos que surja lógicamente en la demanda, es posible conceder un remedio adecuado, cualquiera que este sea. (Énfasis suplido).(13)
I—I HH

Las diferencias entre los casos de autos y el caso de la notoria Ley Núm. 7-2009

Ciertamente erró el foro de instancia al implicar que los casos de autos son similares al caso Domínguez Castro et al. v. E.L.A. I, supra, que interpretó la Ley Núm. 7-2009, Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico. 3 LPRA see. 8791 et seq. Como adelanté, en esta ocasión el interés propietario de los empleados públicos así como la violación de sus derechos adquiridos son sustancialmente distintos en gravedad y naturaleza.
Primeramente, la controversia en el caso Domínguez Castro et al. v. E.L.A. I, supra, se circunscribía básicamente al despido de empleados públicos y principalmente al reclamo de que tales despidos constituían una violación a la cláusula constitucional del debido proceso de ley, en su aspecto sustantivo y procesal.(14) Mientras Domínguez Castro requería meramente un análisis según un escrutinio racional que justificara la acción del Estado, en los casos de *853 autos se trata de un reclamo de una violación a la cláusula de no menoscabo de obligaciones contractuales en el que el propio Estado es el violador del contrato entre las partes, según ya lo determinó el foro de instancia. Como señalamos, tal realidad obliga a un escrutinio más riguroso, otorgándole menos deferencia a la acción legislativa en el análisis de razonabilidad y necesidad.
Además, es claro que si constituye una gran contrariedad la pérdida o disminución de nuestros salarios —como fue el caso Domínguez Castro— mucho peor es la virtual pérdida de una pensión de retiro, sobre todo cuando se ha trabajado y aportado a esta por décadas. Y es que la pérdida de un salario y la pérdida de una pensión no son sinónimos.(15) Mientras —como detallamos más adelante— un empleado público no ostenta un derecho adquirido en la permanencia de su empleo, sí lo tiene en cuanto a su pensión. Pero, además y en el aspecto real o pragmático, la persona que pierde un empleo —sobre todo en los años en que todavía puede ser más productivo— siempre tiene la expectativa de poder conseguir otro. En el ínterin, esa persona descansa en la seguridad de que llegada su vejez, lo que ha aportado a su pensión permanezca inalterado y le sirva para su retiro. Sin embargo, al que conserva su empleo, pero le alteran sustancialmente la anualidad que ha de recibir en el momento de su retiro, no le queda ni opción ni esperanza. Máxime, cuando, como ocurrirá con la mayoría de los empleados públicos a consecuencia de la ley aquí en controversia, si alguno decidiera renunciar y buscar un “nuevo horizonte” con mejores beneficios futuros, no podrá llevarse consigo las aportaciones realizadas a su plan de retiro.(16)
En segundo lugar, en Domínguez Castro, ante el reclamo de los empleados públicos sobre la ilegalidad de sus despidos por la retroactividad de la Ley Núm. 7, no les *854 reconocimos un derecho adquirido, pues no existe ley alguna que expresa o implícitamente le reconozca a un empleado público un derecho irrestricto a no ser despedido, sino todo lo contrario.(17) En ese sentido, señalamos que “no cabe hablar de un derecho adquirido a la retención o a no ser cesanteado de un empleo en el servicio público, pues se encuentra ausente el elemento del amparo de una ley anterior [del Art. 3 del Código Civil] que hubiese concedido tal derecho”.(18) Sin embargo, es claro que los demandantes de los casos de autos sí tienen en sus respectivos contratos de pensiones, no solo un derecho o interés propietario, sino un derecho adquirido mediante la Ley Núm. 447 de 15 de mayo de 1951, según enmendada, 3 LPRA sec. 761 et seq., la Ley Núm. 1 de 16 de febrero de 1990, según enmendada, 3 LPRA sec. 766b et seq., y la Ley Núm. 305 de 24 de septiembre de 1999, según enmendada, 3 LPRA see. 761 et seq. Como señalamos en Domínguez Castro, “no todo derecho o interés propietario es a su vez un derecho adquirido”.(19) Pero los demandantes de los casos de autos, al juramentar como empleados públicos lo hicieron al amparo de unas condiciones contractuales definidas claramente por la ley vigente al momento de su juramentación, lo que constituye claramente un derecho adquirido. Así, recientemente, en Pagán Santiago et al. v. ASR, 185 DPR 341, 354 (2012), señalamos que “la Asamblea Legislativa no tiene facultad para menoscabar ese derecho adquirido de naturaleza contractual, o que ha sido ‘comprado’, por ese participante mediante aportaciones compulsorias provenientes de su salario”.
Por otro lado, en Domínguez Castro et al. v. E.L.A. I, supra, el reclamo de menoscabo contractual que se hizo fue en función, no de las pensiones de retiro de los empleados públicos, sino del incumplimiento temporero de los conve *855 nios colectivos de aquellos servidores públicos unionados por virtud de la Ley Núm. 45 de 25 de febrero de 1998.(20) Específicamente, indicamos que era “meritorio señalar que la legislación impugnada es producto de una situación de emergencia y la suspensión de las disposiciones de los convenios que no sean conformes a la referida Ley Núm. 7 es temporera”. (Enfasis suplido).(21) Como ya expresamos, el contrato que se menoscaba en los casos de autos es la seguridad de las pensiones de retiro de los demandantes y la vigencia de tal menoscabo no es temporera sino permanente.
Es claro entonces, que la naturaleza de la causa de acción y el reclamo constitucional en el caso de la Ley Núm. 7 y los casos de autos son muy distintos. Domínguez Castro era un caso de despidos, alegada violación de debido proceso de ley y menoscabo temporero (en aquellos empleados unionados) de sus convenios colectivos. En los casos de autos nos enfrentamos al reclamo de un menoscabo sustancial y permanente de un contrato entre el Gobierno de Puerto Rico y los empleados públicos,(22) muchos de los cuales han laborado por décadas en el servicio público, haciendo sus aportaciones con una expectativa muy distinta a lo que ahora la Ley Núm. 3-2013 les anuncia.
Ciertamente y como ya señalamos, los beneficios provenientes de planes de pensión claramente pueden ser más importantes que el salario de un empleado.(23) De hecho, como implicamos en el normativo Bayrón Toro v. Serra, 119 DPR 605 (1987), la persona que se convierte en empleado de gobierno con la expectativa de hacer una carrera en el servicio público, no lo hace necesariamente por el salario que recibirá. Ya “ [a] nteriomente hemos reconocido los sacrificios económicos que conlleva la dedicación al servicio *856 público”.(24) Así, señalamos que “[s]ólo si se ofrecen beneficios marginales tales como un atractivo plan de retiro, puede el Gobierno atraer personal competente, que de otra forma ofrecería sus servicios a la empresa privada”.(25) Además, en Bayrón Toro señalamos que “[e]s indiscutible que cuando alguien acepta una oferta de empleo toma en consideración y descansa en la seguridad que le brinda el sistema de retiro que le ofrece dicho empleo”.(26) Ciertamente, estos casos no son Domínguez Castro et al. v. E.L.A. I.
HH 1—i hH
El Sistema de Retiro de los Empleados del Gobierno de Puerto Rico ha confrontado un déficit actuarial desde sus mismos inicios. Basta con citar la propia Exposición de Motivos de la Ley Núm. 3-2013, al describir la primera de las causas principales de la crisis:
Desde sus comienzos, el Sistema no contó con las aportaciones adecuadas para mantener un nivel saludable de solvencia. El Sistema fue diseñado como un sistema de beneficio definido cuyas pensiones estaban fijadas por ley y no dependían del monto de las aportaciones que hicieran los patronos o los empleados. La ley que creó el Sistema estableció un nivel de aportación que no estaba ligado a los beneficios que tenía que pagar el Sistema y tampoco se ajustaba a los cambios económicos o actuariales que afectaban el nivel de beneficios. (Énfasis suplido).(27)
Como vemos, el fundamento de la crisis del Sistema de Retiro estriba en un problema de diseño: la ley que creó el Sistema estableció un nivel de aportación que no estaba *857 ligado a los beneficios que este tenía que pagar y tampoco se ajustaba a los cambios económicos o actuariales que afectaban el nivel de beneficios.
A este problema base se sumó el incumplimiento por parte de las distintas agencias con las aportaciones suplementarias requeridas; la aprobación de varias leyes entre 1960 y el presente que aumentaron los beneficios, pero que no contaron con aportaciones adicionales, y el hecho de que el gobierno nunca realizó la aportación patronal recomendada por los actuarios para poder cubrir los beneficios de retiro.(28) De manera que al cuestionarnos: ¿cuándo ha estado bien financieramente nuestro Sistema de Retiro? La contestación es nunca. O, expuesto de otra forma, ¿desde cuándo ha existido el déficit del Sistema de Retiro? La contestación, por la admisión que hace la propia Ley Núm. 3-2013, es siempre. La conclusión entonces es que el problema deficitario siempre ha existido; siempre ha sido el mismo, pero se ha ido agravando por las propias acciones incorrectas del Gobierno.
Con relación a lo anterior, me parece justo lo implicado por el Tribunal Supremo federal al final de la opinión en U.S. Trust Co. of New York v. New Jersey, supra, pág. 32, y que ha sido adoptado en otras jurisdicciones. Y es que, de determinarse que el problema que el Estado busca resolver con la implantación del estatuto que menoscaba el contrato en cuestión existía al momento cuando se incurrió en la obligación, tal menoscabo no puede determinarse como razonable y necesario. Massachusetts Community College Council v. Com., 649 N.E.2d 708, 713 (1995). (“An impairment is not a reasonable one if the problem sought to be resolved by an impairment of a contract existed at the time the contractual obligation was incurred”). (Enfasis suplido). Incluso, si los cambios ocurridos a través de los años hasta el momento en que se propuso la medida que menoscaba el contrato, obedecen a un incremento de lo que *858 en esencia es el mismo problema habido cuando se contrató originalmente, el menoscabo es irrazonable e innecesario. Carlstrom v. State, 694 P.2d 1, 5 (Wash. 1985) (“The United States Supreme Court has observed that if the state is aware of problems when it enters into a contract, the state cannot impair those contracts on the basis of problems that have only changed in degree rather than in kind”). (Enfasis suplido). No me cabe la menor duda de que esta es la situación en los casos de autos.
IV
En Bayrón Toro señalamos que “[l]a solución más adecuada es aquella que nos permita armonizar, por un lado, el interés de proteger los derechos de los participantes y, por el otro, el de permitirle al Estado la libertad de adoptar cambios que garanticen la estabilidad y solvencia del sistema”.(29) Ante un claro menoscabo no solo sustancial sino drástico de los beneficios de los demandantes, específicamente por la reducción de sus anualidades futuras, se imponía que el foro de instancia encontrara ese balance entre las necesidades reales del Sistema de Retiro y los derechos de los empleados. Entiendo que al final, tal balance hubiera requerido que el foro primario preservara la constitucionalidad de la inmensa mayoría de las enmiendas establecidas por la Ley Núm. 3-2013. Sin embargo, creo que la reducción en las anualidades futuras de los empleados públicos, en el grado que fue impuesta, no pasa el cedazo constitucional por constituir una medida demasiado drástica, ante la existencia de posibles opciones más moderadas que sirven el mismo fin.
Advierto en la decisión que hoy toma la Mayoría de esta Curia lo que me sospecho es una actuación cuidadosa, recelosa, suspicaz ante la amenaza de una degradación del *859 crédito del País. Sin embargo, con nuestra decisión permitimos que a nuestros servidores públicos, víctimas inocentes de los errores del Estado, se les quite tanto sin que se les conceda nada.
Por todo lo anterior, respetuosamente disiento.

 Oregon State Police Officers’ Ass’n v. State, 323 Or. 356, 374 (1996).

 Para los policías, solo estaría disponible la segunda opción porque estos están obligados a retirarse a los 58 años de edad.

 32 LPRA Ap. V.

 Trans-Oceanic Life Ins. v. Oracle Corp., 184 DPR 689, 701 (2012).

 Colón v. Lotería, 167 DPR 625, 649 (2006).

 íd.

 R. Hernández Colón, Derecho procesal civil, 5ta ed., San Juan, Ed. Lexis-Nexis, 2010, pág. 268.

 Véanse alegaciones 4.58 y 4.59 de la Petición presentada ante el Tribunal de Primera Instancia.

 Véase la Exposición de Motivos de la Ley Núm. 3-2013.

 U.S. Trust Co. of New York v. New Jersey, 431 US 1 (1977).

 Hernández Colón, op. cit., pág. 268. Véase, además, Ashcroft v. Iqbal, 556 US 662 (2009).

 íd.

 J.A. Cuevas Segarra, Tratado de derecho civil, 2da ed., San Juan, Pubs. JTS, 2011, T. II, pág. 529.

 Domínguez Castro et al. v. E.L.A. I, 178 DPR 1, 38-48 (2010).

 Oregon State Police Officers’ Ass’n v. State, 323 Or. 356, 374 (1996).

 Véase Art. 5-110 de la Ley Núm. 3-2013.

 Domínguez Castro et al. v. E.L.A. I, supra, págs. 67-70.

 íd., pág. 69.

 íd., pág. 68.

 3 LPRA sec. 1451 et seq.

 Domínguez Castro et al. v. E.L.A. I, supra, págs. 89-90.

 Pagán Santiago et al. v. ASR, 185 DPR 341 (2012).

 Oregon State Police Officers’ Ass’n v. State, supra; Rose City Transit Co. v. City of Portland, 271 Or. 588 (1975).

 Bayrón Toro v. Serra, 119 DPR 605, 616 (1987).

 íd.

 íd.

 Exposición de Motivos de la Ley Núm. 3-2013, pág. 5.

 íd.

 Bayrón Toro v. Serra, supra, pág. 618.