Opinión disidente emitida por el
Juez Asociado Señor Rivera García.
“El sustento de miles de servidores públicos merecía un Tribunal que examinara a cabalidad sus planteamientos de acuerdo con la prueba que en su momento se presentara, y no que se atendieran sus reclamos mediante una decisión que valida, cual sello de goma, los argumentos del Estado”.(1)
El 11 de jimio de 2013, una mayoría de este Tribunal emitió una resolución en la cual le ordenó al Tribunal de Primera Instancia (TPI) que, con suma diligencia y premura, celebrara una vista evidenciaria en los casos de epígrafe y, además, emitiera los remedios provisionales necesarios para que se atiendan a tiempo las reclamaciones de los peticionarios. El foro primario atendió el caso y desestimó las causas de los demandantes. Hoy, una mayoría de este Tribunal avala este endeble rumbo decisorio.
En la nefasta opinión que hoy se certifica, una-mayoría ha optado por navegar un curso de acción apresurado, sin que se haya presentado en los tribunales la prueba necesaria para establecer que las modificaciones al Sistema de Retiro constituyen la alternativa menos onerosa a la luz de la situación fiscal de Puerto Rico. Peor aún, so pretexto de *860 atender una crisis, a fin de cuentas el resultado nos lleva inevitablemente hacia una hecatombe mayor. Con esta decisión, se conduce al servidor público a un estado de indefensión y se le condena a a que viva al final de su carrera, en el ocaso de su existencia, al borde de la pobreza. Sin duda alguna, el Estado, haciendo uso de su poder, ha echado a un lado al empleado público que por años dedicó su vida al servicio del pueblo. Ante la postura pusilánime asumida por cinco miembros de este Tribunal, no me queda más que disentir.
I
En vista de que se ordenó que se consolidaran los casos y que las controversias de estos están estrechamente entrelazadas, exponemos los hechos por separado para facilitar su comprensión.

CT-2013-08

En este caso tenemos ante nuestra consideración una demanda presentada el 21 de mayo de 2013 por Víctor A. Trinidad Hernández y otros 45 miembros de la Policía de Puerto Rico (los peticionarios) contra el Gobierno de Puerto Rico y la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico (Sistema de Retiro). Estos impugnan la constitucionalidad de la Ley Núm. 3-2013 (Ley 3) por menoscabar su relación contractual con el Gobierno y tener una aplicación arbitraria e irrazonable al alterar los beneficios de retiro que tenían la expectativa de recibir. Además, solicitan que se emita un injunction preliminar y permanente para detener su implantación.
En síntesis, los peticionarios alegan que están cobijados por la Ley Núm. 447 de 15 de mayo de 1951, según enmendada, 3 LPRA see. 761 et seq. (Ley 447), y la Ley Núm. 1 de 16 de febrero de 1990 (3 LPRA sec. 766b et seq.), que aplica a aquellos empleados que entraron al Sistema de Retiro *861 después del 1 de abril de 1990. La See. 3 de la Ley Núm. 1 (3 LPRA sec. 766d) establece una pensión idéntica a la pensión por mérito de la Ley 447, dirigida únicamente a los miembros de la Policía. Plantean, además, que las enmiendas realizadas por la Ley 3 son inconstitucionales, toda vez que constituyen un menoscabo sustancial de su relación contractual con el Estado.
Esto, pues con la aprobación de la Ley 3, se enfrentan a un panorama de retiro totalmente distinto al que planificaron. Aducen que tienen derecho a retirarse con una anualidad equivalente a 75% de su salario promedio si cuentan con treinta años de servicio y con al menos 55 años de edad al momento de su retiro, o 65% de su salario promedio si cuentan con treinta años de servicio y menos de 55 años de edad.
Con la aprobación de la Ley 3, supra, se enmendó la Ley Núm. 447 y con ello el compromiso y la garantía que tenían los peticionarios de recibir una pensión correspondiente al 75% o 65% de su salario promedio. Establece esta ley, además, que aquellos que se retiren antes de 30 de junio de 2013, podrán continuar recibiendo las aportaciones gubernamentales al plan médico así como el bono de medicamentos y el bono de navidad. Por el contrario, aquellas personas que se retiren del 1 de julio de 2013 en adelante no recibirán estas aportaciones. Asimismo, cuestionan la eliminación de la pensión por incapacidad y la imposición de un seguro compulsorio por incapacidad.
Por otro lado, como agravante, los peticionarios expresan que son servidores públicos de alto riesgo y que no pueden aportar al Seguro Social, por lo que no recibirán pensión alguna por ese concepto cuando se retiren. Así pues, luego de varios incidentes procesales acaecidos en el Tribunal de Primera Instancia, el señor Trinidad Hernández y otros presentaron el 5 de junio de 2013 un recurso de certificación ante esta Curia. Examinada la petición, emitimos una resolución en la que, entre otros asuntos, se or *862 denó al Tribunal de Primera Instancia a que celebrase una vista evidenciaria no más tarde de 18 de junio de 2013, en la que las partes presentaran prueba sobre las edades de los demandantes y los años cotizados en el servicio público.
Conforme a ese mandato, el foro primario emitió una orden en la que citó a las partes a una vista evidenciaria el 18 de junio de 2013, a las 8:30 a. m. No obstante, el 17 de junio de 2013 desestimó esta demanda mediante Sentencia Declaratoria e Injunction. De esta determinación se presentó ante el Tribunal de Apelaciones un recurso de apelación. Sin embargo, ante la inminencia de la entrada en vigor de la Ley 3, los peticionarios acuden ante nos mediante una petición de certificación. En esencia, nos solicitan que ante el poco tiempo que falta para que entre en vigor la Ley 3, actuemos con celeridad y expidamos el auto de certificación.

CT-2013-09

Los peticionarios en este caso son 68 empleados de la Oficina del Contralor de Puerto Rico que entraron en el servicio público hace más de 23 años. Entre estos, figuran el Subcontralor de Puerto Rico; la Directora de Auditoría de los Sistemas de Retiro y Asuntos Financieros de la Oficina del Contralor; la Directora Ejecutiva de la Oficina de Asuntos Legales, Investigaciones y Litigios; el Director Ejecutivo de la Oficina de Prevención y Anticorrupción; el Director de la División de Análisis de Datos Forense Digital y Desarrollo Tecnológico; la Directora de Auditoría Interna; la Directora Ejecutiva de la Oficina de Asuntos de Auditorías; el Director de la División de Auditorías de Departamentos y Agencias, y la Directora de la División de Auditorías de Municipios, además de varios subdirectores de divisiones, gerentes, auditores y ayudantes ejecutivos.
Todos estos empleados han aportado al Sistema de Re-tiro vigente de forma compulsoria. Por formar parte del servicio público antes del 1 de abril de 1990, cada uno está protegido por la estructura de beneficios que adquirieron *863 cuando comenzaron sus labores. Cada uno es participante en un plan de pensión de tipo “beneficio definido” basado en la Ley 447, estatuto que estableció la llamada “pensión por mérito”. Por décadas, se les ha garantizado que al día de su retiro, disfrutarán de una anualidad equivalente a 75% de su salario promedio si cuentan con 30 años de servicio y con al menos 55 años de edad al momento de retirarse, o 65% de su salario promedio si no cuentan con 55 años de edad. Los peticionarios tienen entre 44 y 57 años de edad y todos han cotizado para su plan de retiro por más de 20 años al amparo de la Ley 447. Empero, hoy ninguno ha alcanzado los 55 años de edad ni los 30 años de servicio que los cualifica para recibir la pensión por mérito.
Actualmente, los demandantes se enfrentan a tener que optar entre dos alternativas: (1) retirarse en o antes del 30 de junio de 2013 para acogerse al sistema antiguo de re-tiro, o (2) continuar trabajando en el Gobierno por un espacio de entre 1.6 a 17 años adicionales a lo contemplado en la ley anterior para, eventualmente, jubilarse con una anualidad significativamente menor a la que les fue prometida cuando ingresaron al sistema y quedar desprovistos de un plan médico, beneficio que también tendrían al amparo de la Ley 447.
Por esta razón, el 8 de mayo de 2013, los peticionarios presentaron una petición ante el TPI para solicitar una sentencia declaratoria e interdicto preliminar y permanente para impugnar la constitucionalidad de ciertas disposiciones de la recién aprobada Ley 3, que menoscaban su derecho a retirarse según el plan por el cual contrataron con el Gobierno de Puerto Rico.
Luego de varias incidencias procesales, y al igual que en el caso anterior, la Sra. María del Carmen Alvarado y otros presentaron el 5 de junio de 2013 un recurso de certificación ante este Tribunal. Posteriormente, ordenamos al Tribunal de Primera Instancia que celebrara una vista evidenciaría antes del 18 de junio de 2013. Sin embargo, el *864 foro primario desestimó la demanda de autos el día antes de celebrar la vista.
Inconformes con ese proceder, los peticionarios presentaron ante el Tribunal de Apelaciones un recurso de apelación. No obstante, ante la proximidad de que cobren vigencia las disposiciones de la Ley 3, supra, acuden ante nos mediante una petición de certificación. En esencia, nos solicitan que expidamos el auto y que declaremos inconstitucional las condiciones de la Ley Núm. 3 que tienen el efecto de menoscabar las relaciones contractuales del Gobierno con los empleados.

CT-2013-10

El presente recurso es instado por 50 empleados de la Autoridad de Acueductos y Alcantarillados, cuatro empleados del Departamento de la Vivienda, tres del Municipio de Bayamón, uno del Departamento de Transportación y Obras Públicas, uno del Departamento de Asuntos del Consumidor, y dos del Departamento de la Familia. Estos plantean que la Ley 3 menoscaba retroactivamente los derechos adquiridos por los peticionarios al amparo de la Ley 447 y a la luz de la indubitada relación contractual existente entre estos y la Administración del Sistema de Retiro. Alegan, además, que esa relación contractual les fue impuesta por parte del recurrido como requisito compulsorio e irrevocable cuando fueron reclutados en sus respectivos empleos.
Cónsono con lo anterior, los peticionarios arguyen que confiados en la certidumbre de sus derechos y las obligaciones del Gobierno, planificaron su futuro económico con la expectativa de acogerse al retiro con los beneficios y en las fechas que las leyes correspondientes establecían. Fundamentan su posición en que realizaron préstamos, los cuales están pagando, para que le acreditaran tiempo no cotizado y así completar los años requeridos. De igual forma, alegan que tenían planes de saldar sus deudas con la liquidación a la que tienen derecho para luego costear *865 sus gastos con lo que recibirían de pensión. Arguyen, además, que rechazaron ofertas de empleo más lucrativas en el sector privado por no poner en riesgo su retiro.
Al igual que los casos anteriores, los peticionarios confrontan una situación espinosa: optar por una pensión sustancialmente menor a la pactada o continuar trabajando un gran número de años adicionales para finalmente recibir una pensión menguada y sin los beneficios de plan médico, bonos y bajo unas condiciones totalmente diferentes.
En atención a ello, el Sr. José A. De Jesús Vera y otros presentaron, el 6 de junio de 2013, una petición de sentencia declaratoria e interdicto provisional y permanente ante el TPI. Este recurso fue consolidado a nivel de instancia con los casos mencionados y, al igual que estos, sus reclamaciones fueron desestimadas por el foro primario el 17 de jimio de 2013.
Ante el factor inminente de que cobren vigencia los postulados de la Ley 3, los peticionarios presentaron un recurso de certificación ante este tribunal. En este, nos solicitan que con carácter de urgencia expidamos el auto solicitado y declaremos la inconstitucionalidad de la Ley Núm. 3, ordenemos la celebración de una vista ante un Comisionado Especial a los fines de determinar la edad de los demandantes y los años cotizados al Sistema de Retiro. Además, nos imploran que emitamos una orden de interdicto preliminar contra la Administración de Retiro, para prohibirle realizar gestión o trámite alguno sobre el retiro de los peticionarios hasta la adjudicación del presente recurso.
hH I—I
A. Antes de entrar a discutir el marco doctrinal que aplica a los reclamos de los demandantes, debemos expresarnos respecto a la procedencia de la petición de injunction preliminar que presentaron ante el TPI.
*866 Cuando emitimos nuestra resolución de 11 de junio de este año, fuimos enfáticos en que “de no proveerse un remedio interlocutorio oportuno, los peticionarios se ver[í] an obligados a tomar decisiones drásticas que podrían ir desde renunciar a sus empleos y acogerse a un plan de pensión menor del esperado o continuar trabajando por años y acogerse a la nueva estructura de retiro provista por esa ley”.(2) Ciertamente, el TPI posee discreción para otorgar este tipo de remedios. 32 LPRA see. 3522. Sin embargo, ante la situación particular que presentan estos casos, era procedente que se emitiera un interdicto preliminar para paralizar los efectos de la Ley 3, en lo que se dilucidaba esta controversia. Elaboremos.
Como regla general, un interdicto para suspender los efectos de una ley es improcedente. Art. 678 del Código de Enjuiciamiento Civil, 32 LPRA see. 3524. No obstante, el citado precepto en su inciso (3) dispone, en lo pertinente, que:
[...] [Un] tribunal podrá dictar orden de entredicho provisional, injunction preliminar o permanente sujeto a los términos de la Regla 57 de Procedimiento Civil:
(a) En aquellos casos en que ello sea indispensable para hacer efectiva su jurisdicción y previa una determinación de que la orden es indispensable para evitar un daño irreparable a la parte peticionaria.
(b) Cuando en la petición se alegue que alguna persona, bajo la autoridad de alguna ley, ordenanza, o reglamento del Estado Libre Asociado de Puerto Rico, esté privando o sea el causante de que alguien esté privando al peticionario de algún derecho, privilegio o inmunidad protegido por la Constitución o las leyes del Estado Libre Asociado de Puerto Rico o por la Constitución o leyes de los Estados Unidos de América que sean aplicables a las personas bajo la jurisdicción del Estado Libre Asociado de Puerto Rico.
Disponiéndose, además, que al dictar dicha orden el tribunal debe considerar el interés público envuelto y concluir que la parte peticionaria tiene una posibilidad real de prevalecer en *867 los méritos de su petición. Dicha orden sólo tendrá vigor en el caso específico ante el tribunal y entre las partes. (Enfasis nuestro).
El caso ante nuestra consideración involucra asuntos complejos que requieren una dilucidación seria y ponderada. Precisamente, por esa razón es que se le ordenó al foro primario que celebrara una vista evidenciaría. Así también, ante la postura del TPI de no celebrarla ni emitir remedio provisional alguno, se hacía necesario que hoy emitiéramos un interdicto preliminar paralizando la vigencia de la Ley Núm. 3, supra, para que este pleito se pudiera atender correctamente. Y es que no existía otra forma de evaluar responsablemente los reclamos de los demandantes en este caso. Sin ánimos de ser repetitivos, nos remitimos a todas las razones que para ello esbozamos en nuestra resolución del pasado 11 de junio. Como bien ex-presó el Juez Presidente hace pocos años, “[;ri\o haberles provisto a las partes una oportunidad adecuada de probar sus puntos de vista y disponer del caso sin el rigor que nos exige una controversia como la de autos, es a todas luces contraria al principio de igualdad procesal que debe regir todo proceso judicial [...] priva a los empleados públicos afectados de sus derechos adquiridos sin tan siquiera haberles provisto un proceso judicial completo y transparente”.(3) (Énfasis nuestro).
Concluido este primer asunto, entendemos que los hechos de este caso presentan una fuerte presunción de que los artículos de la Ley 3 que afectan los derechos adquiridos de los participantes del Sistema de Retiro mediante la *868 Ley 447, supra, son inconstitucionales y, por ende, se hacía imperativo acceder a la petición de interdicto preliminar de los peticionarios. Pasemos ahora a exponer el derecho aplicable a los planteamientos constitucionales de los demandantes que a nuestro juicio operan con mayor fuerza en detrimento de la constitucionalidad de esas disposiciones.
B. Toda comunidad políticamente organizada tiene lo que se conoce como “police power” o poder público del Estado, que opera en función de salvaguardar la seguridad, la salud y el bienestar de sus habitantes. Domínguez Castro et al. v. E.L.A. I, 178 DPR 1, 36 (2010). Ese poder es amplio y responde a las circunstancias de cada caso. Así por ejemplo, la precariedad económica es “una realidad que necesariamente pesa en la definición del ámbito de la acción gubernamental bajo el poder de razón de Estado”. Id., pág. 37. Ahora bien, ello no implica que ese poder se pueda ejercer de manera omnímoda en ausencia de parámetros.
En Puerto Rico, la protección de las relaciones contractuales encuentra apoyo en el Art. II, Sec. 7 de nuestra Constitución, LPRA, Tomo 1, que prohíbe que se promulguen leyes que menoscaben las obligaciones contractuales. Esa disposición es análoga al Art. I, sec. 10 de la Constitución federal, LPRA, Tomo 1, por lo que al interpretar la nuestra, debemos mirar cómo el Tribunal Supremo federal ha evaluado esa cláusula. Tales decisiones constituyen las protecciones mínimas que nos vemos precisados a proveer en nuestro ordenamiento. Domínguez Castro et al. v. E.L.A. I, supra, pág. 80; Bayrón Toro v. Serra, 119 DPR 605 (1987). Cabe señalar que mediante ésta se protegen las obligaciones entre partes privadas como las contraídas por el Estado.
Es conocido que la cláusula contractual no constituye una prohibición absoluta, pues como ya mencionamos, el Estado tiene la facultad de reglamentar en favor del bienestar del pueblo. Bayrón Toro v. Serra, supra, pág. 619. En *869 otras palabras, no prohíbe que se promulgue ninguna legislación que tenga el efecto colateral de menoscabar una obligación contractual pública o privada. U.S. Trust Co. of New York v. New Jersey, 431 US 1, 20-21 (1977). Lo que hay que observar es si el menoscabo sobrevive al escrutinio constitucional. Id.
Para evaluar las situaciones en que el Estado modifica sus propias obligaciones, el escrutinio que se emplea es más cuidadoso que el que se utiliza cuando el Gobierno interfiere en relaciones contractuales privadas. Es decir, es más severo. Véanse: Domínguez Castro et al. v. E.L.A. I, supra, pág. 81; Bayrón Toro v. Serra, supra; Warner Lambert Co. v. Tribunal Superior, 101 DPR 378 (1973). La función del foro judicial es evaluar la validez de la legislación estableciendo un balance entre el poder del Estado para salvaguardar el bienestar ciudadano y el interés de proteger las relaciones contractuales. Id.
Como cuestión de umbral, al analizar reclamaciones según esta doctrina es preciso auscultar si existe una relación contractual sobre la cual se reclama la protección. Domínguez Castro et al. v. E.L.A. I, supra, págs. 81—84; U.S. Trust Co. of New York v. New Jersey, supra. En ese ejercicio, procede examinar si la actuación estatal ha menoscabado sustancialmente esa relación. Id. Por último, el hecho de que eso haya ocurrido no implica que la actuación gubernamental se convierta ipso facto en inconstitucional. Id. La medida del Estado podría prevalecer si a pesar de menoscabar la relación contractual, es necesaria y razonable y persigue adelantar un propósito gubernamental importante. Id.
Expuesto este marco general, pasemos a discutir más detalladamente la doctrina.
1. Relación contractual entre el Estado y los servidores públicos demandantes
En el caso de autos la relación contractual que pretenden vindicar los demandantes deriva de la Ley 447, que *870 creó el Sistema de Retiro. Ese estatuto, ¿puede considerarse como un acuerdo contractual entre el Estado y el empleado? Veamos.
Para propósitos de determinar que una legislación es inconstitucional en el contexto de que el Estado se obligó contractualmente con el demandante mediante cierta legislación, es necesario que de la medida en controversia se deriven derechos contractuales. NRPC v. Atchinson, T. & S.F.RY Co., 470 US 451, 466-467 (1985). Pues como regla general, las medidas legislativas no crean automáticamente una relación contractual con las personas beneficiadas por el estatuto de que se trate. Id.
No obstante, varios tribunales estatales han resuelto que los estatutos referentes a los sistemas de retiro dan génesis a una relación contractual.(4) Nuestra norma jurisprudencial nos lleva a la misma conclusión. De hecho, desde Bayrón Toro v. Serra, supra, rechazamos la teoría arcaica de que las pensiones de los empleados públicos retirados eran una mera dádiva del gobierno e hicimos hincapié en que estas constituían una obligación del Estado cimentada en bases de moral. Dijimos también allí que “los participantes de un Sistema de Retiro del Gobierno tienen un derecho adquirido de naturaleza contractual que surge con el ingreso del empleado al sistema, independientemente de que la participación sea voluntaria o compulsoria”. Id., pág. 618. Esta norma derrota cualquier *871 alegación que pretenda convencemos de que no existen derechos adquiridos sobre la pensión antes de que el empleado se retire. Si fuera así, ¿por qué Bayrón Toro nos enfatiza que ese derecho adquirido de naturaleza contractual surge con el ingreso del empleado al sistema?
Tan recientemente como el año pasado en Pagán Santiago et al. v. ASR, 185 DPR 341, 352 (2012), reiteramos lo que habíamos colegido en Bayrón Toro respecto a que
“[e]l derecho a pensión de retiro por años de servicio del empleado público tiene un respetable contenido ético y moral y constituye un seguro de dignidad para el hombre o la mujer que habiendo dedicado al servicio público sus años fecundos, no debe encontrarse en la etapa final de su vida en el desamparo, o convertido en carga de parientes o del Estado”.(5) Pagán Santiago et al. v. ASR, supra, pág. 353.
Finalmente, acotamos que entre el Estado y el empleado existe un acuerdo de voluntades que produce un efecto jurídico vinculante para ambas partes, lo que hacía que el plan de retiro al amparo de la Ley 447, supra, fuera parte de ese contrato. Pagán Santiago et al. v. ASR, supra, pág. 353. Sostuvimos entonces que por esa razón “la Asamblea Legislativa no tiene facultad para menoscabar ese derecho adquirido de naturaleza contractual, o que ha sido ‘comprado’, por ese participante mediante aportaciones compulsorias provenientes de su salario”.(6) Id., pág. 354.
Nótese la connotación que se le da a la pensión de los empleados, impartiéndole características de un derecho adquirido fundamentado en una relación contractual. Esta es la norma establecida por este Tribunal hace años y que hasta hoy no ha sido revocada. Y aún en caso de que no existiera ese precedente, para evaluar el reclamo contractual procedería estudiar el lenguaje de la ley para ver si se *872 desprende un intento legislativo de crear derechos de ese tipo. Véase NRPC v. Atchinson, T & S.F.RY. Co., supra.
En ese sentido, podemos mencionar como ejemplo la Ley Núm. 35-2007 (3 LPRA sees. 766 y 766d), que enmendó la Ley 447, supra, en varios aspectos. Entre las enmiendas se aumentó un 3% a las pensiones que allí se mencionaron. Esos aumentos se concedieron porque el legislador reconoció que “con el paso del tiempo, el aumento en el costo de vida conlleva una disminución relativa de las anualidades de lo(a)s pensionado(a)s”. Exposición de Motivos de la Ley Núm. 35-2007, 15ta Asamblea Legislativa, 5ta Sesión Ordinaria, pág. 1. Asimismo, añadió que de esa manera “el Gobierno enfrenta la obligación moral de ayudar a mejorar la condición de vida de los pensionados, personas que dieron lo mejor de su vida en el servicio al Pueblo de Puerto Rico”. íd.
Aprovechamos la coyuntura para plasmar la ironía de “la obligación moral” que existió para aumentarle un 3% a las pensiones de retiro en aquel entonces, pero que hoy no existe para garantizarles un retiro digno a los demandantes. Fíjese que a costa de esa y otras medidas poco analizadas es que esa “obligación moral”para con los retirados se desvanece entre las páginas de la Exposición de Motivos de la Ley 3, supra.
Así pues, quedando meridianamente claro que el precedente jurídico y las expresiones legislativas avalan la existencia de una relación contractual en cuanto a las pensiones de retiro, pasemos al siguiente asunto ante nuestra consideración.
2. Menoscabo sustancial de los acuerdos contractuales entre los servidores públicos y el Estado
Como regla general, la cláusula constitucional contra el menoscabo de las obligaciones contractuales se activa cuando la modificación afecta de manera adversa los términos esenciales que se tuvieron en cuenta al momento de contratar, de modo que se afecten las expectativas razona *873 bles de las partes. Domínguez Castro et al. v. E.L.A. I, supra, pág. 83. Véase, también, Baltimore Teachers Union v. Mayor, 6 F.3d 1012 (4to Cir. 1993).
Cuando resolvimos Bayrón Toro v. Serra, supra, dictaminamos que ciertas enmiendas al Sistema de Retiro de los empleados de la Universidad de Puerto Rico no eran irrazonables. Se estableció los 55 años como la edad mínima de retiro, se redujo el importe de la pensión a los participantes que se jubilaran antes de los 58 años de edad y se aumentó la aportación de los participantes al fondo del sistema. En ese caso, antes de la enmienda todo participante aportaba mensualmente 4% de los primeros $350 de su sueldo, más, el 6.5% del sueldo restante. Luego de la enmienda, la aportación mensual de un 4% se aumentó a un 5% del sueldo mensual hasta la cantidad máxima cotizable al seguro social y en lugar de un 6.5 % se aportaría el 7% de la porción del sueldo en exceso de esa cantidad. Estos hechos, en nada se asimilan a la situación de los hoy demandantes, quienes verán sus beneficios reducidos dramáticamente.
En ese mismo caso, dijimos que cuando un empleado se ha retirado y cumple con todas las condiciones para el re-tiro, su pensión no está sujeta a menoscabo. Empero, antes de que ese empleado se acogiera al retiro, los términos del sistema podían enmendarse si las modificaciones eran razonables y con el fin de adelantar la solvencia del sistema. Y es que no debe ser de otra forma. La cláusula constitucional no le prohíbe al Estado poner en vigor medidas que tengan el efecto colateral de menoscabar una obligación contractual. Ahora bien, esto debe hacerse en los parámetros de la necesidad y razonabilidad.
3. Criterios de necesidad y razonabilidad
Un menoscabo contractual sustancial no es razonable si el problema que se intenta resolver mediante la medida impugnada existía cuando el Estado entró en la obligación contractual que se intenta proteger. Si ese problema previ *874 sible se agravó con el tiempo, pero se agravó solo en cuanto al grado o magnitud, el menoscabo no es razonable. Véase U.S. Trust Co. of New York v. New Jersey, supra, pág. 31; Massachusetts Community College Council v. Com., 649 N.E.2d 708 (1955). Así se resolvió en Carlstrom v. State, 103 Wash.2d 391 (1985), cuando le correspondió al Tribunal Supremo de Washington dilucidar si por el hecho de haber declarado una emergencia fiscal, el Gobierno podía negarse a honrar sus acuerdos contractuales con la parte demandante. El Tribunal señaló que, aunque la situación financiera había empeorado, lo que ocurrió fue un cambio en el grado del problema y no en la clase o tipo de problema. También se concluyó que como las medidas impugnadas eran irrazonables no necesitaba abordar el cuestionamiento en cuanto a si eran necesarias.(7)
Por otra parte, en Singer v. City of Topeka, 607 P.2d 467 (Kan. 1980), el Tribunal Supremo de Kansas señaló que las modificaciones a los planes de pensión eran razonables si tenían una relación material con la esencia del sistema de retiro y si propendían a su administración exitosa. No obstante, cambios que resultaran en desventajas para los empleados debían venir acompañados con nuevas ventajas. Véase, además, Calabro v. City of Omaha, 247 Neb. 955 (1995). Ese análisis comparativo de desventajas y nuevas ventajas compensatorias debe enfocarse en el empleado que tiene el derecho a la pensión. Betts v. Board of Administration, 582 P.2d 614 (Cal. 1978).
Existe cierta controversia en los tribunales apelativos del circuito federal en cuanto a cuál de las partes tiene la carga probatoria para demostrar la ausencia o presencia *875 de la necesidad y razonabilidad de la medida impugnada.(8) Varias interpretaciones han surgido a partir del caso normativo U.S. Trust Co. of New York v. New Jersey, supra. Allí el Máximo Foro federal hizo la expresión siguiente: “the State has failed to demonstrate that repeal of the 1962 covenant was similarly necessary”. Id., pág. 30.
En 2007, la Corte de Apelaciones de Estados Unidos para Cuarto Circuito resolvió que el demandante es quien debe demostrar que hubo un menoscabo contractual y que el Estado no ejerció legítimamente su poder de reglamentación. Catawha Indian Tribe of South Carolina v. City of Rock Hill, SC, 501 F.3d 368, 371 (4to Cir. 2007). Poco después, en Fraternal Order v. Prince George County, 645 F. Supp.2d 492, 508 (4to Cir. 2009), ese tribunal señaló:
To pass constitutional muster, however, a State, or as in the present case, a County, when exercising this power, by enacting legislation that constitutes a substantial impairment of its own contracts, must demonstrate that the legislation is “reasonable and necessary to serve an important public purpose”.
Sin embargo, hace poco en United Auto., Aerospace, Agr. Implement Workers of America Intern. Union v. Fortuño, 633 F.3d 37, 45-47 (1er Cir. 2011), el Primer Circuito le impuso la carga de la prueba a la parte que reclama que el menoscabo a la obligación contractual no era razonable ni necesario. Pero, tan reciente como el año pasado, el cuarto circuito en Cherry et al. v. Mayor and City Council of Baltimore,(9) expresó:
[...] However, the Fortuño court addressed the matter in the initial pleading context, holding that generalized allegations of illegitimate purpose and the existence of other alternatives are insufficient to allege a plausible claim that challenged legislation was not reasonable and necessary to serve an impor *876 tant public purpose. In sum, the Court finds the burden of proof issue unresolved, at least for courts outside the First Circuit.
In any event, the Court will assume that Plaintiffs have the burden of proving that the impairment of their contract rights by the Ordinance was not “reasonable and necessary to serve an important public purpose.” As discussed herein, Plaintiffs have carried that burden, if they had it. (Escolio omitido).
Si bien el Tribunal concluyó que los demandantes habían cumplido con su carga probatoria, si alguna, dejó constar lo siguiente:
If required to predict the burden of proof allocation that would be adopted by the appellate courts, the Court would find a useful analogy in the McDonnell Douglas burden of proof scheme. Mc Donnel Douglas Corp v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed. 2d 668 (1973). Therefore, consistent with the First Circuit decision in Fortuno, the Court would impose a threshold burden on a plaintiff to plead (and ultimately to prove) facts sufficient to create a prima facie case that an impairment was not “reasonable and necessary to serve an important public purpose”. Then, the ultimate burden would be on the plaintiff to disprove the government unit’s asserted basis for contending that the impairment was “reasonable and necessary to serve an important public purpose”. Id., esc. 15.
Así mismo lo concluyó el Juez Presidente señor Hernández Denton hace poco más de tres años al interpretar U.S. Trust Co. of New York v. New Jersey, supra, expresó lo siguiente:
[e]n cuanto a la valoración de los elementos de razonabilidad y necesidad de una medida impugnada en casos como el de autos, el máximo foro federal resolvió que no procede otorgarle deferencia absoluta al juicio legislativo cuando el propio interés del Estado está en juego. Lo contrario, razonó el Tribunal Supremo federal, implicaría que la cláusula constitucional contra el menoscabo de las obligaciones contractuales no proveería protección alguna y, en esencia, sería letra muerta. Por lo tanto, el Estado debe probar en los tribunales que la medida es razonable y necesaria. (Enfasis en el original suprimido, énfasis suplido y citas omitidas). Domínguez Castro et al. v. E.L.A. I, supra, pág. 104, opinión disidente del Juez Presidente Señor Hernández Denton.
*877 En ese proceder de evaluar la razonabilidad y necesidad de una medida que menoscaba una obligación contractual —aunque con un alcance algo indefinido— el Estado disfruta de una limitada deferencia que se le debe al criterio de la Legislatura en relación a si la obligación contractual debe perjudicarse. U.S. Trust Co. of New York v. New Jersey, supra, pág. 26. Cuando se alega que el Estado menoscabó un contrato público del cual es parte, la determinación de razonabilidad y necesidad de la Asamblea Legislativa merece menos deferencia. Id. Una deferencia completa en estos casos no es apropiada porque es el propio interés del Estado el que está en juego. Id. Aporta a la determinación final de razonabilidad de la medida el hecho de que la legislación impugnada se promulgue debido a una situación de emergencia y que su aplicación sea temporal o transitoria. Domínguez Castro et al. v. E.L.A, I, supra, pág. 85. No obstante, la existencia de un interés público importante no es suficiente para prevalecer en cuanto a la limitación constitucional. U.S. Trust Co. of New York. v. New Jersey, supra, pág. 21. No se sostendrá el menoscabo de una obligación contractual si para alcanzar el objetivo perseguido por el Estado existen otras medidas alternas menos severas. Id., pág. 27.
Ante este marco normativo discutamos por qué entendemos que las secciones de la Ley 3 que afectan los derechos adquiridos de los participantes del Sistema de Retiro bajo la Ley 447, presentan una fuerte presunción de inconstitucionalidad.
III
A. La Ley 3 menoscaba sustancialmente la relación contractual entre los demandantes y el Gobierno de Puerto Rico
Comencemos explicando a rasgos generales cómo opera el sistema de retiro de los demandantes.
*878 La Ley 447 creó el Sistema de Retiro de los empleados del Gobierno de Puerto Rico en 1951, con un programa de retiro de beneficios definidos.(10) Este tuvo el propósito de garantizarles a sus participantes un ingreso sustentable una vez concluida su carrera en el servicio público. El Sistema se nutre de las contribuciones individuales de cada uno de los participantes y se considera un fideicomiso, ya que los fondos deben utilizarse “en provecho de los miembros participantes de su matrícula, sus dependientes y beneficiarios, para el pago de anualidades por retiro y por incapacidad, anualidades y beneficios por defunción y otros beneficios”. 3 LPRA sec. 761. Véanse: Pagán Santiago et al. v. ASR, supra, pág. 352; Aquino González v. A.E.E.L.A., 182 DPR 1 (2011).
El Sistema tiene tres estructuras de beneficios: (1) el plan de retiro según la Ley 447 para los participantes que entraron al Sistema antes de 1 de abril de 1990 y al cual pertenecen los peticionarios; (2) la estructura mediante la Ley Núm. 1 de 16 de febrero de 1990, supra, y (3) el plan de retiro conocido como Reforma 2000 para aquellos participantes que entraron al Sistema a partir del 1 de enero de 2000.
Ahora bien, con la aprobación de la Ley 3, se crea un nuevo sistema de retiro a base de un Programa Híbrido de Contribuciones Definidas. El sistema nuevo elimina por completo el criterio de mérito por años de servicio y también aumenta la edad de retiro a 61 años para los empleados cobijados por la Ley 447. Ciertamente, esta es la primera vez que el Gobierno aplica cambios sustanciales de forma retroactiva a los planes de retiro de sus servidores *879 públicos. A pesar de que en 1990 ese principio de mérito fue eliminado para los nuevos empleados, los peticionarios continuaron bajo el sistema pactado al momento de su reclutamiento. Es decir, los cambios anteriores se han realizado de forma prospectiva sin menoscabar los intereses de los que ya eran participantes y sus derechos adquiridos a través de los años.
Contrario a lo que ha sido la práctica en el pasado, las enmiendas aprobadas mediante la Ley 3 implican un aumento drástico en la cantidad de tiempo que tendrán que trabajar los empleados para cualificar y poder retirarse. Aun así, después de esos años adicionales de servicio, solo tendrán derecho a una pensión considerablemente menor a la pactada al momento que ingresaron al Sistema de Retiro. Todo ello constituye un menoscabo sustancial y severo a su relación contractual con el Estado.
B. El fin público que se intenta alcanzar con la Ley Núm. 3 y la razonabilidad de esa medida.
Ciertamente, alcanzar la estabilidad del Sistema de Re-tiro es un fin público de gran envergadura y es sumamente apremiante atender esa crisis. Ahora bien, las medidas que aquí se impugnan, ¿son razonables y necesarias?
Cuando el TPI analizó el reclamo de los demandantes sobre si la Asamblea Legislativa consideró alternativas menos onerosas para atender el problema fiscal del Sistema, este foro concluyó que “la determinación del Legislador en cuanto a la serie de medidas escogidas constituye un ejercicio de política pública, que merece deferencia [...] por lo que no corresponde realizar una determinación de novo sobre la misma”. Tiene razón el foro primario en que el criterio de razonabilidad y necesidad del legislador merece deferencia. Domínguez Castro et al. v. E.L.A. I, supra, pág. 85. Pero como ya explicamos, cuando se trata de casos en los que el Estado es parte de la obligación contractual, ese análisis es más cuidadoso. Lo mínimo que eso implica es que se debe ponderar adecuadamente si lo que el legis *880 lador impregnó en la ley es razonable y necesario para alcanzar el fin público que se busca. No se puede dar deferencia al criterio legislativo meramente porque el legislador opina que la medida es razonable. Hay que evaluar si existían alternativas menos onerosas, si el problema que se intenta remediar era conocido o desconocido, si se compensan los daños causados, entre otras cosas. Lo contrario equivaldría a obviar toda la norma jurisprudencial que hemos discutido que señala que el foro judicial debe justipreciar esos criterios lo que sería muy conveniente para el Estado.
Para que esto se lograra se hacía necesario emitir un injunction preliminar y ponderar la prueba pertinente.(11) Por ello entendemos que, ante el menoscabo sustancial que evidentemente han sufrido los demandantes, le correspondía al Estado presentar prueba de que las medidas impugnadas eran necesarias y razonables como bien lo puntualizó el Juez Presidente en su opinión disidente de Domínguez Castro. En cuanto a esto encontramos muy acertadas las expresiones que se hicieron en Cherry et al. v. Mayor and City Council of Baltimore, supra, disponiendo que una vez los demandantes demostraran que sufrieron un menoscabo sustancial, la carga probatoria pasa al Estado. Así pues, le correspondía al Estado probar en este caso que era necesario y razonable afectar tan dramáticamente las pensiones de los empleados que ya estaban a punto de retirarse. También debía demostrar que era razonable y necesario obligarlos a trabajar un sin número de años adicionales para al final recibir menos beneficios.
Cónsono con lo anterior, una razón por la cual entendemos que las secciones de la Ley 3 que afectan los derechos adquiridos de los participantes del Sistema de Retiro según la Ley 447 son irrazonables es debido a que los proble *881 mas que intenta remediar no eran desconocidos para el Estado cuando entró en una obligación contractual con sus empleados mediante la Ley 447. Esto requiere que dediquemos algunas líneas para explicar con detalle a lo que nos referimos.
El Sistema de Retiro ha carecido de una buena planificación así como de un sistema de contribución eficiente desde sus inicios en 1951. Surge del estudio intitulado Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico, que la estructura del sistema ha estado arruinada por años.(12) No obstante, se señala qué acciones que se realizaron en el periodo de 2004 a 2008 han exacerbado el deteriorado estado fiscal del sistema.(13) Entre estas, la emisión de los bonos de obligaciones de pensión o Pension Obligation Bond Transactions (POB, por sus siglas en inglés), los programas o ventanas de retiro temprano,(14) el incremento en la cuantía permitida de préstamos personales, procedimientos inadecuados y las leyes especiales de concesión de beneficios para retirados, a saber, bonos de verano, bonos para medicamentos, aguinaldo de Navidad, ajustes por costo de vida, entre otros.(15)
*882 Específicamente, el estudio critica severamente el aumento en la cantidad permitida por préstamo personal contra los fondos de retiro, de $5,000 a $15,000.(16) Esto, porque ello tuvo un efecto nefasto sobre la liquidez del sistema. De las entrevistas realizadas por los investigadores a varios empleados clave, se llegó a la conclusión de que al permitir ese cambio en 2007, no se ejerció el debido cuidado por la administración y la Junta de Directores.(17) No constaban en archivos análisis documentados ni información que indicara que incrementar la cuantía de los préstamos personales era un paso fundamentado, hecho con el debido análisis que revelara el impacto que ello tendría sobre la salud financiera del sistema. Esa documentación nunca apareció, y es que, según los propios empleados del sistema, esos análisis nunca se realizaron.(18)
De otra parte, en 2008, los POB se aprobaron para resolver el problema de liquidez del Retiro. Al emitir los bonos se incrementarían los activos del sistema y, por ende, el coeficiente de financiación, el cual se esperaba aumentara en un 70% según se estimó. Sin embargo, ese efecto nunca se alcanzó. Surge que los cálculos realizados para verificar el resultado de esa emisión sobre el coeficiente de financiación fueron erróneos, pues ignoraron la deuda en la que consistió la emisión. Realmente, el incremento sería en un 9.7%, un porcentaje drásticamente menor al estimado por el Sistema de Retiro durante el proceso de emisión. Esta crasa falta llevó a los autores del estudio a *883 cuestionar cómo los responsables en la toma de decisiones entraron en este tipo de transacción, y se les escapó un paso tan fundamental en el método de cómputo del coeficiente de financiación.(19) Según establece el estudio, los riesgos de esa decisión no se midieron o no se entendían, lo que indica que tanto la gerencia como la Junta de Síndicos del Sistema de Retiro y la Junta de Directores del Banco Gubernamental de Fomento fueron negligentes. El arreglo de la liquidez del sistema a corto plazo realmente provocó un problema mayor que ha resultado en grandes costos que se pagarán en décadas por venir.(20) Precisamente, en consideración a ello, se recomendó en el informe que las autoridades correspondientes realizaran más investigaciones sobre la toma de decisiones que permeó el proceso de la emisión de bonos en 2008.(21) Hasta ahora, lo único que sabemos es que la factura se le pasó a quien no tuvo la culpa: los servidores públicos que hicieron sus aportaciones y confiaron el fruto de su trabajo a un sistema mal manejado.
Entre otros errores administrativos, que ahora paga el pueblo, resaltamos que varias leyes especiales que otorga *884 ban beneficios se aprobaron ignorando las metas de reforzar el sistema, de manera que este contara con fuentes suficientes de fondo a largo plazo. Entre ellas, algunas fueron la Ley Núm. 524-2004, la Ley Núm. 144-2005 (3 LPRA sec. 761 n. y 18 LPRA sec. 383) y la Ley Núm. 35-2007, supra. De esta forma, los beneficios especiales, los cuales no son un componente explícito del Sistema de Retiro han sido cubiertos con sus activos. Esto, pues, el Fondo General, las corporaciones públicas y municipios han faltado a su responsabilidad de pagar los beneficios concedidos por estas leyes especiales.(22) Tanto así que para jimio de 2009, los beneficios provistos por las leyes especiales ocupaban $2.3 billones de $19 billones en deudas actuariales del sistema.
Como vemos, es más que obvio que el Estado conocía la crisis por la que atraviesa la Administración del Sistema de Retiro cuando contrató con los demandantes. Es cierto que la estabilización del Sistema de Retiro no deja de ser un “propósito público importante” por el hecho de que era previsible la severa crisis que se intenta remediar mediante la Ley 3. Sin embargo, las enmiendas impugnadas no son razonables al analizarlas desde esta perspectiva. El hecho de que exista un deseo genuino de aminorar ese problema no implica que automáticamente la Ley 3 sea razonable en toda su extensión. Véase U.S. Trust Co. of New York v. New Jersey, supra.
Así también, si analizamos las medidas impugnadas de la Ley 3, examinando las ventajas y desventajas es más que predecible el resultado. La desventaja que se legisla no viene acompañada de ningún beneficio, como se ha resuelto en algunas jurisdicciones estatales. Todo lo contrario, quedan desamparados con la ínfima pensión que recibirán.
*885 Por otra parte, en cuanto a los criterios de razonabilidad y necesidad el Estado alega que este caso es similar a Domínguez et al. Castro v. E.L.A. I, supra, donde se evaluó la constitucionalidad de la Ley 7. En ese caso es que se am-para una mayoría de este Tribunal para darle la espalda a los servidores públicos puertorriqueños. Veamos cómo un examen de las dos medidas legislativas nos lleva a concluir que la pauta allí establecida no es óbice para que atendamos los reclamos de los demandantes.
C. “Domínguez Castro v. E.L.A. I” es distinguible del caso de autos
Hoy, una mayoría de este Tribunal fundamenta su decisión en un análisis equivocado del caso Domínguez Castro et al. v. E.L.A. I, supra. Ese caso trataba sobre el Plan Integrado de Estabilización que incluía despidos de empleados públicos al amparo de la Ley Núm. 7-2009, según enmendada, denominada como la Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico.
Contrario a lo que concluye la mayoría, los hechos en Domínguez Castro no representan la misma situación que en el caso de autos. La Opinión del Tribunal se recuesta de los fundamentos de ese precedente, pero se equivoca al ignorar las diferencias básicas entre ambos estatutos. Veamos.
En Domínguez Castro esta Curia estableció que la ley era razonable y necesaria y que la razón principal para su aprobación era la crisis fiscal que existía y que le impedía al Gobierno incluso pagar la nómina gubernamental en ese momento. Allí la Asamblea Legislativa realizó un análisis de otras medidas que fueron presentadas y evaluadas conjuntamente con las medidas propuestas en esa ley. Sobre este particular el tribunal resolvió haciendo alusión a la Exposición de Motivos de la Ley Núm. 7-2009:
*886 “Todas las alternativas típicamente usadas como pasos previos a la reducción de personal [o sea] traslados, reubicaciones, readiestramientos, licencias sin sueldo y reducción de jornada, entre otros no son viables dentro del contexto de la magnitud del déficit estructural del Gobierno y la precariedad de la situación. Es necesario reducir dramáticamente y de forma expedita, el gasto gubernamental. En vista del tamaño de la nómina y del tamaño del déficit, ninguna de las demás alternativas es compatible con este objetivo o no son viables ante su impacto sobre la operación del Gobierno. Los traslados, las reubicaciones y los readiestramientos meramente transfieren el empleado y, por consiguiente, el gasto de un lado a otro. La reducción general de jornada y mucho menos las licencias sin sueldos, no son alternativas viables pues tendrían que ser de tal magnitud y duración que impactarían gravemente la gobernabilidad de la Rama Ejecutiva”.
Por otro lado, y como bien se explica en la Exposición de Motivos de la ley, el establecer medidas impositivas únicamente, tampoco es una alternativa viable. De manera que, la Asamblea Legislativa, como funcionarios electos y legítimos representantes del Pueblo de Puerto Rico, determinaron que la imposición al contribuyente de los recaudos necesarios para cerrar una brecha de $3,200 millones en el déficit ahogarían a la ciudadanía y hundirían a Puerto Rico en una depresión catastrófica. (Enfasis en el original suprimido, énfasis suplido, corchetes en el original y escolio omitido). Domínguez Castro et al. v. E.L.A. I, supra, págs. 61-62.
Como puede observarse, en aquella ocasión validamos la razonabilidad y necesidad de la Ley Núm. 7-2009 debido a que esta se aprobó luego de evaluar otras alternativas y determinar que estas no podrían resolver la crisis fiscal de aquel momento. En otras palabras, las medidas impuestas al amparo de la Ley Núm. 7-2009 eran las menos onerosas en las alternativas disponibles para lograr el fin propuesto.(23)
*887 Ahora bien, a diferencia de la Ley Núm. 7-2009 en esta Ley Núm. 3-2013 no surge de la Exposición de Motivos cuales fueron las gestiones hechas durante el proceso legislativo para evaluar otras alternativas menos onerosas que pudiesen resolver la crisis que afecta al Sistemas de Retiro. Lo que sí surge de la exposición de motivos es que, distinto al panorama de insolvencia económica que imperaba en momentos que se aprobaba la Ley Núm. 7-2009 el Gobierno no tenía la solvencia económica para pagar la nómina gubernamental en ese momento, el Sistema de Re-tiro tiene fondos suficientes para cubrir sus gastos hasta el 2018. Por tal razón, era imperativo que se estudiara esta situación con más detenimiento y se evaluaran otras alternativas, previo a la aprobación de la ley.
No obstante, a pesar de presentar una variedad de razones que llevaron a los problemas fiscales que atraviesa el Sistema de Retiro, la ley se limita, exclusivamente, a disminuir los beneficios de los empleados. No se menciona en toda la Ley 3 una sola alternativa que haya sido considerada y que las aprobadas finalmente fueran las menos onerosas. Todo ello, en clara distinción a la Ley Núm. 7-2009.
Por otro lado, la Ley Núm. 7-2009 establecía tres fases que ofrecían diversas opciones en beneficio de los empleados que voluntariamente se acogieran a estas. Así pues, en la Fase 1 de implementación, el empleado o empleada tenía la opción de: (1) acogerse a una reducción permanente de jornada si contaba con más de veinte años de servicio, de hacerlo, recibiría un incentivo económico; (2) renunciar voluntariamente, recibiendo ayudas incluyendo que el Gobierno subsidiaría el primer año de su sueldo en el sector privado o en alguna organización sin fines de lucro, además de brindar incentivos económicos según el tiempo que llevaba trabajando; (3) vales educativos para que finaliza *888 ran sus estudios; (4) vales de adiestramiento para que aprendieran las herramientas necesarias que les permitiera reintegrarse a la fuerza laboral; (5) recibir subsidio económico de plan médico hasta por un año; (6) el pago de gastos de relocalización si el cambio requería una mudanza, y (7) vales para establecer un negocio propio.
La Fase II, por su parte, comenzaría con despidos de empleados irregulares o transitorios, pasando luego a los regulares, de ser necesario, y siguiendo el principio de antigüedad. Los empleados afectados bajo esta fase recibirían el pago del plan médico por seis meses y podían participar en el Programa de Alternativas al Empleado, además de ser incluidos en un registro de elegibles por el cual tendrían prioridad sobre otros candidatos para ser contratado en una agencia en la que se desempeñaran labores similares. Es decir, la Ley Núm. 7-2009 creó un registro de reingreso al gobierno con prioridad para aquellas personas cesanteadas.
Finalmente la Fase III incorporaba dos medidas adicionales: (1) la congelación de aumentos, beneficios marginales o compensación adicional, y (2) la suspensión de ascensos, traslados y movimiento de personal.
Distinto a la Ley 3, la Ley Núm. 7-2009 era de carácter temporero y su vigencia fue de dos años. Por el contrario, las enmiendas aprobadas al Sistema de Retiro condenan a miles de servidores públicos a un nuevo estado de pobreza y de marginación social. No existe un periodo de orientación o de espera suficiente para que el empleado pueda tomar una decisión ponderada que le permita lidiar con un cambio tan súbito en sus planes de vida, tanto emocional como financieramente.
Por otro lado, diferente a la Ley Núm. 7-2009, los empleados no tienen otra alternativa, más allá de retirarse para no perder beneficios pactados previamente como el pago de plan médico y el bono de navidad. Tampoco existen medidas para compensar de alguna manera el menoscabo *889 de las relaciones contractuales de los empleados por parte de la aprobación de esta ley. No hay vales, ni posibilidades de readiestramiento, ni incentivos, ni subsidios para empresas del sector privado que puedan contratarle. No existe compensación alguna que aminore los severos daños que sufrirán los demandantes a causa del menoscabo de sus expectativas contractuales con el Gobierno. Estos daños cobran más fuerza en el caso de los miembros de la fuerza policiaca, quienes no cotizan para el Seguro Social y que, por mandato de ley, deben retirarse a los 58 años de edad. La medida impugnada no contiene disposición alguna que intente aminorar los vejámenes y vicisitudes que tendrán que enfrentar los peticionarios.
Cabe señalar, además, que un importante pronunciamiento en Domínguez Castro et al. v. E.L.A. I, supra, fue la inaplicabilidad del Art. 3 del Código Civil, 31 LPRA sec. 3, que dispone que “[e]n ningún caso podrá el efecto retroactivo de una ley peijudicar los derechos adquiridos al amparo de una legislación anterior”. Entonces resolvimos que un empleado despedido por virtud de la Ley Núm. 7-2009 no podía “hablar de un derecho adquirido a la retención o a no ser cesanteado de un empleo en el servicio público, pues se encuentra ausente el elemento del amparo de una ley anterior que hubiese concedido tal derecho”. (Enfasis nuestro y en el original). Domínguez Castro et al. v. E.L.A. I, supra, págs. 69—70. Es decir, en ausencia de orna ley que los protegiera, el Art. 3 del Código Civil, supra, no los cobijaba.(24)
La situación de los peticionarios y sus derechos al amparo de la Ley 447 es ampliamente distinta. Estos claramente tienen sus derechos garantizados por una ley anterior. Si bien podría argumentarse que ese derecho se activa una vez el empleado se retira y comienza a devengar *890 su pensión, ciertos pronunciamientos de Bayrón Toro v. Serra, supra, nos motivan a rechazar ese planteamiento.
En ese caso señalamos que “los participantes de un Sistema de Retiro del Gobierno tienen un derecho adquirido de naturaleza contractual que surge con el ingreso del empleado al sistema, independientemente de que la participación sea voluntaria o compulsoria”. Bayrón Toro v. Serra, supra, pág. 618. La naturaleza contractual y el tratamiento que se le ha impartido a la relación que existe entre los empleados públicos y el Gobierno varían en las distintas jurisdicciones estatales. Pero aquí en Bayrón Toro concluimos que los participantes de un sistema de retiro tienen un derecho de naturaleza contractual desde que ingresan al Sistema, eso quiere decir, desde que comenzaron a cotizar para este. De esta forma, todo menoscabo a ese derecho debe pasar el crisol de la razonabilidad y necesidad.
Igualmente, es preciso recordar que la Quinta Enmienda de la Constitución de Estado Unidos establece: “[N]or shall private property be taken for public use, without just compensation”. Asimismo, nuestra Carta Magna dispone en su Art. II, Sec. 9, en lo pertinente, que: “No se tomará o perjudicará la propiedad privada para uso público a no ser mediante el pago de una justa compensación y de acuerdo con la forma provista por ley”. LPRA, Tomo 1, ed. 2008, pág. 323.
En casos sobre controversias de legislaciones que afectan los sistemas de pensiones de empleados públicos es común que se hagan planteamientos sobre incautación en conjunto a reclamaciones bajo el menoscabo de relaciones contractuales. En ese contexto, el interés del empleado en las promesas contractuales puede constituir un derecho propietario cuando estas estén protegidas por la cláusula del menoscabo de las relaciones contractuales o la doctrina *891 estatal sobre el sistema público de pensiones.(25) J.M. Beermann, The Public Pension Crisis, 70 Wash. & Lee L. Rev. 3, 63-64 (2013). El Tribunal Supremo de Estados Unidos ha señalado que los intereses propietarios se extienden más allá de las formas tradicionales de propiedad, tales como el dinero, inmuebles, entre otros bienes. Regents v. Roth, 408 U.S. 564, 577 (1972). A esos efectos, la Corte Suprema ha expresado que:
[...] To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead have a legitimate claim of entitlement to it.
Asimismo, hemos expresado que son factores que determinan la existencia de un interés propietario el hecho de que un interés esté protegido por ley o que las circunstancias creen una expectativa de continuidad. Domínguez Castro et al. v. E.L.A. I, supra. De esa forma, al considerar la constitucionalidad de las enmiendas legislativas a los planes de pensiones la determinación sobre los derechos adquiridos de un empleado yace en si este tiene suficientes años de servicio en el sistema y si ha descansado o confiado sustancialmente en el recibo de tales beneficios contratados. Véanse: Booth v. Sims, 456 S.E.2d 167, 181 (1995); J.M. Beermann, The Public Pension Crisis, 70 Wash. & Lee L. Rev. 3, 40 (2013).
Los demandantes ciertamente tienen un derecho propietario sobre su pensión según acordada y sobre las aportaciones hechas al sistema. Véase Bayrón Toro v. Serra, supra, pág. 612. Pero el reclamo de los empleados cobijados *892 por la Ley 447, supra, descansa en que con el pasar del tiempo confiaron en que a través de su esfuerzo laboral y sus aportaciones obtendrían los beneficios acordados contractualmente al alcanzar las edades dispuestas en la disposición. Después de todo, su seguridad económica y su calidad de vida están de por medio y ello tendrá un efecto social que de una forma u otra padeceremos todos.(26) Estas enmiendas despojan a los participantes de sus derechos adquiridos a recibir una pensión completa y su expectativa sobre la fecha para acogerse al plan de retiro.
En fin, surge con meridiana claridad que el análisis de la constitucionalidad de la Ley tiene que realizarse distinguiéndolo considerablemente del examen elaborado en Domínguez Castro y la evaluación de razonabilidad y necesidad de la Ley Núm. 7-2009. Hacer lo contrario denota una equívoca metodología adjudicativa sin precedentes. Para dar la atención meritoria a estos asuntos tan sensitivos y de vital importancia para la estabilidad social y económica de estas personas, era necesario auscultar responsablemente los reclamos de los peticionarios.
La opinión de la mayoría, Per curiam, pág. 831, señala que “[a]nte este dilema, examina [ron] cuidadosamente los recursos presentados a la luz de nuestro ordenamiento constitucional [...]”. Respetuosamente dudamos de esa aseveración, pues “para determinar los hechos relevantes, la opinión mayoritaria se sustenta exclusivamente en la Ex-posición de Motivos y acepta, sin prueba, [...] que no existe otra opción para corregir el déficit”.(27) “En otras palabras, *893 la mayoría de este Tribunal no tomó en consideración posiciones distintas a la adoptada por la Legislatura, porque no hubo oportunidad para recibir y dirimir prueba en un Foro de Primera Instancia o administrativo”.(28) (Enfasis en el original). Esto, pues “lo único que hay en los expedientes de los casos es la demanda, el recurso de certificación y las mociones interlocutorias” (énfasis suprimido),(29) y de esta forma la mayoría quiere “apresurarse a resolver el asunto constitucional”.(30) “Un análisis somero de los ex-pedientes de los recursos consolidados nos permite percibir que las controversias que se presentan no tan sólo son complejas, sino múltiples y diversas”.(31)
Cada uno de estos asuntos pudo requerir la intervención del foro administrativo o del Tribunal de Primera Instancia para dirimir la prueba y crear un expediente que permitiera la labor efectiva de los foros apelativos, incluyendo la de este Tribunal Supremo. Es axiomático que el derecho no se aplica en el vacío, requiere de hechos que sirvan de base para aplicar las normas. (Énfasis suprimido).(32)
Tal como dijimos en nuestra resolución del pasado 11 de junio “los intereses públicos involucrados en estos casos son excepcionales. Los peticionarios han hecho unos planteamientos que merecen una consideración seria y pronta”. (Énfasis suplido). Alvarado Pacheco y otros v. ELA., 188 DPR 594, 623 (2013). “La Ley Núm. 3, supra, entra en vigor en poco menos de un mes y, de no proveerse un remedio interlocutorio oportuno, los peticionarios se verán obligados a tomar decisiones drásticas [...] las repercusiones de estos casos pueden afectar a los peticionarios por el resto de sus días”. (Énfasis suplido). Resolución del Tribunal Supremo de 11 de junio de 2013, María del C. Alvarado Pacheco et *894 al. v. E.L.A., CT-2013-05/06/07. Las Juezas Asociadas Señoras Rodríguez Rodríguez y Fiol Matta emitieron votos particulares disidentes. El Juez Presidente Señor Hernández Denton emitió un voto particular disidente. El Juez Estrella Martínez emitió un voto particular y disintió en que no se expidieran en aquel momento los autos de epígrafe.
Es insostenible que hoy una mayoría de este Foro se olvide de todas esas y otras tantas palabras. Cómo mínimo este Tribunal debió proveerles a los demandantes la oportunidad de que presentaran su caso, cumpliendo cada parte con su carga probatoria. Hace poco este Tribunal en Lozada Sánchez et al. v. JCA, 184 DPR 898 (2012), se ex-presó muy acertadamente respecto a cómo deben decidir los jueces. Allí dijimos:
En tiempo reciente no hemos vacilado en indicar que a “los jueces no nos puede dominar el temor a decidir” [...] Ahora, tenemos que añadir que la imparcialidad debe ser la piedra angular que guíe nuestros razonamientos, sin importar quiénes sean las partes ni la empatia que sus planteamientos nos provoquen. Eso implica que si bien nuestras ideas y experiencias influyen en nuestro análisis al momento de adjudicar una controversia, debemos analizar los argumentos de las partes involucradas como lo haría la famosa Dama de la Justicia, con la mayor objetividad que nuestra condición humana nos permita. En esta coyuntura, conviene recordar cómo Juan Carlos Mendonca describe el mandamiento judicial de la imparcialidad:
[...] El litigante lucha por su derecho, en tanto que tú luchas por el derecho; y esto no debes olvidarlo nunca. No te dejes llevar por sus simpatías o antipatías, por conveniencias o compasiones, por temor o misericordia. La imparcialidad implica el coraje de fallar contra el poderoso, pero también el valor, mucho más grande, de fallar contra el débil. (Citas omitidas), íd., pág. 926.
IV
Todo lo que hemos enunciado nos lleva a la conclusión de que algunas secciones la Ley 3 son irrazonables, lo que *895 nos sugiere están revestidas de fuertes visos de inconstitucionalidad. Los problemas que se intentan remediar con esa medida no eran desconocidos para el Gobierno de Puerto Rico a través de las décadas en que mantuvo a sus servidores públicos a la expectativa de que tendrían un retiro digno y justo. Tampoco se les compensa con algún tipo de beneficio la severidad del menoscabo en sus expectativas de retiro. Para evaluar esta controversia con más detenimiento y responsabilidad era necesario que emitiéramos el injunction preliminar que nos solicitaron los peticionarios para paralizar la aplicación de esa ley.
Según expresé recientemente, “[el] último foro representativo del Poder Judicial, no puede callar mientras se diseña el escenario perfecto para un ardid contra el pueblo de Puerto Rico”.(33) Hoy, lamentablemente la mayoría de esta Curia por razones que, en su consciencia llevarán, han desatendido su responsabilidad con nuestros ciudadanos. A mucho pesar, ciertamente es un día lúgubre para las familias y el pueblo puertorriqueño. Ahora me resta esperar que en un futuro quienes ocupen posiciones de liderato en el servicio público nunca olviden que la persona no está en función del sistema económico, sino que es el sistema económico el que está en función de la persona.
Hoy el Estado plantea enérgicamente que este Tribunal no debe pasar juicio sobre la sabiduría legislativa que se empleó cuando la Asamblea promulgó la Ley 3. Quieren total deferencia. Sin embargo, nos preguntamos si esa misma sabiduría legislativa fue o pudo ser un factor determinante de la crisis que hoy se intenta resolver a costa del empleado público. En esto son pertinentes las palabras que hace más de dos décadas plasmó el entonces Juez Asociado Alonso Alonso en su voto particular en Bayrón Toro v. Serra, supra, pág. 624:
*896 [e]l Estado no debe justificar cambios al sistema de retiro al alegar que son necesarios y razonables para mantener la solvencia económica de éste cuando la debilidad fiscal del mismo se debe al descuido y a la falta de cuidado del Estado propiamente.
En cuanto a esto también es preciso que hagamos cons-tar cierta preocupación de los demandantes, la cual transcribimos según ellos mismos la han expresado:
[germinamos indicando que el planteamiento mediático de los demandados de que la responsabilidad del crédito de Puerto Rico está en manos del Tribunal Supremo es absurdo y más aún, un medio de presión del Ejecutivo para obtener su propósito. Es imperioso e indispensable recordar la separación de poderes, que a su vez implica una separación de responsabilidades, de nuestro sistema democrático. El rol de los Tribunales en el sistema judicial no es proveer las alternativas para resolver la crisis fiscal de la Isla ni del Sistema de Retiro. El rol es asegurarse que en el descargue de sus poderes, las demás ramas de gobierno, a quienes sí les corresponde buscar alternativas, no se excedan de las facultades conferidas por ley ni incidan inconstitucionalmente sobre los derechos adquiridos de las personas a quienes gobiernan; más aún de sus propios empleados, con quienes contratan. Petición de certificación Victor A. Rivera et. al. v. E.L.A., et. al., pág. 24.
Como último foro judicial estatal, en aras de promover un verdadero acceso a la justicia, debemos preguntarnos: ¿conocemos a las comunidades que servimos? Soy del criterio que, como consecuencia de esta detrimental medida legislativa, los retos económicos de toda una generación están incrementándose severa y adversamente. Empero, la comunidad de futuros pensionados afectados por la Ley 3, supra, ahora parece ser un “obstáculo para el crecimiento financiero” y damos por buenas las acciones del Gobierno sin más preguntas o análisis objetivos. Si hoy cientos de miles de puertorriqueños viven bajo los niveles de pobreza, sin infraestructura básica, bajo condiciones ambientales *897 difíciles y viviendas deficientes(34) esta decisión judicial será el opresor de otros miles más. En ese sentido, concuerdo con la aseveración siguiente:
[W]e must reject abstract neutrality and acquire a different kind of objectivity, assume our role as guardians of procedural fairness, and learn to value the feelings and ideas of others [...]
Under the Constitution, the primary function of a judge is to guarantee the fundamental constitutional rights of every person. This duty is based on the conviction that judges, as citizens who are aware of the value of these rights in a democratic society, choose their profession knowingly, and they assume responsibility for protecting those rights. They are committed to this end, and part of this commitment is to be aware of the great adversities faced by communities that have limited access to courts, whose members hope to find a helping hand among legal professionals [...]
Judges as human beings are the sum of their own diverse experiences, ideas, situations, expectations, and realities. Therefore, when a judge neglects to recognize her own subjectivity, her judgments will be inevitably biased. We must become aware of our own subjectivities, ideologies, and paradigms. By doing so, we may be able to exercise our judgment more effectively and more closer to a truly impartial assessment of events. Our goal, the, is not neutrality but a reasonable objectivity.(35)
Si hoy los Jueces y las Juezas de este Tribunal no se hubieran apartado de estas sabias expresiones, estoy seguro de que actuarían como guardianes de nuestra Constitución. Asimismo, en las páginas de la historia de nuestro Pueblo no se escribiría de la nueva clase de pobreza que hoy están avalando. Espero que los estudiosos de estos temas puedan responsable y objetivamente escuchar el grito de justicia de estos empleados y no yerren como esta Curia hoy lo hace al ignorar los preceptos que en algún momento juró defender.
*898 No olvidemos que el pueblo espera de los jueces que siempre estemos ávidos a escuchar las posturas que le plantean las partes en un pleito. Asimismo, espera que el juez sea un árbitro que cante las jugadas como las ve, no como otros pretenden que se vean. Que el éxito en las decisiones económicas que se pretenden implantar bajo el palio del bienestar común jamás sea pretexto para atropellar al ser humano y menos aún menospreciar su dignidad. Es oportuno evocar la ilustre frase de Cicerón, “summum ius summa iniuria”.
Por todos los fundamentos que anteceden, disiento.

 Opinión disidente emitida por la Juez Asociada Señora Rodríguez Rodríguez, Domínguez Castro et al. v. E.L.A. I, 178 DPR 1, 158 (2010).

 Resolución de 11 de junio de 2013, María del C. Alvarado Pacheco, et al. v. E.L.A., CT-2013-05/06/07, pág. 25.

 Domínguez Castro et al. v. E.L.A. I, 178 DPR 1, 110 (2010), opinión disidente del Juez Presidente Señor Hernández Denton. En esa misma línea, opina el Prof. Paul Secunda, quien al respecto nos dice:
“[...] Because of the lack of legal uniformity in public pension regulation from one state to the next, the only possible way to determine whether state curtailment of public employee pension rights will be constitutional is by undertaking an in-depth legal analysis of the applicable pension laws, regulations, ordinances, court opinions and prior settlements”. (Énfasis nuestro). P.M. Secunda, Constitutional Contract Clause Challenges in Public Pension Litigation, 28 Hofstra Lab. & Em. L.J. 263, 300 (2011).

 Muchos estados siguen la teoría contractual. Según este alcance, existe una relación contractual entre el Estado, como el patrono, y el empleado público en cuanto a los beneficios que se le han garantizado mediante la ley. En algunos estados los beneficios adquieren la categoría de derechos adquiridos dependiendo la etapa laboral en que se encuentre el empleado, por ejemplo: cuando comenzó a trabajar e ingresó al sistema de retiro; luego de cada día de servicio rendido en el empleo; cuando el empleado satisface los requisitos de elegibilidad o, cuando el empleado se retira y comienza a devengar su pensión. En otros estados los empleados obtienen derechos adquiridos absolutos en el plan de pensión una vez entran al sistema. Otros, tienen una visión más restrictiva. Para una discusión general sobre este asunto. Véase E.M. Madiar, Public Pension Benefits under Siege: Does state law facilitate or block recent efforts to cut the pension benefits of public servants'! 27 ABA J. Lab. & Emp. L. 179 (2012). Véase también, J.M. Beermann, The Public Pension Crisis, 70 Wash. & Lee L. Rev. 3, 40 (2013).

 Citando a Rosa Resto v. Rodríguez Solis, 111 DPR 89, 92 (1981).

 Citando a Calderón v. Adm. Sistemas de Retiro, supra, págs. 1041-1042. Claro está, esa limitación a menoscabar la relación contractual se encuentra supeditada al poder de razón del Estado que discutimos previamente.

 "Since the State was fully aware of its financial problems while negotiating and prior to signing the Agreement, it cannot now be permitted to avoid the Agreement based on those same economic circumstances. Although the financial situation worsened, it was a change in degree, not in kind. We therefore find as a matter of law that because the State’s acts were not reasonable in view of the circumstances existing when it entered into a contract, [...] Finding the State’s acts unreasonable, we need not reach the question of necessity”. (Enfasis nuestro). Carlstrom v. State, 103 Wash.2d 391, 397 (1985).

 Véase Secunda, supra, pág. 283.

 2012 WL431446. http://www.gpo.gov/fdsys/pkg/USCOURTS-mdd-l_10-cv01447/pdfTJSCOURTS-mdd-l_10-cv-01447-0.pdf.

 Es importante señalar las características generales de un sistema de pensiones de beneficios definidos. En este tipo de plan el patrono tiene la carga de aportar fondos al sistema de pensión en bases actuariales de modo que existan suficientes fondos para pagarle al empleado cuando se retire. Para una explicación más detallada véase, Secunda, supra, Parte I.

 Al tener ante nuestra consideración un asunto tan importante, teníamos a nuestra disposición la Regla 51 del Reglamento del Tribunal Supremo de 2011 (4 LPRA Ap. XXI-B) que establece que este Tribunal puede a iniciativa propia ordenar que se celebre una vista evidenciaría ante un comisionado especial.

 Véase también la Exposición de Motivos de la Ley 116-2011.

 Véase Apéndice I del caso Núm. CT-2013-06, Otero Ruiz et al. v. E.L.A. et al. Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico, Conway MacKenzie, Inc. Octubre 2010.

 Es preocupante que recientemente se haya aprobado la Ley 27-2013 que creó una ventana de retiro tempano a los empleados de la Autoridad de Puertos de Puerto Rico que tuvieran al menos veinte años de servicio. Más aún, la ley tiene vigencia inmediata a partir de su aprobación el pasado el 17 de junio de 2013. Esa ley en su Art. 1 señala que se promulga en estricto cumplimiento con las leyes laborales y los derechos adquiridos de los servidores públicos. Además, se les proveerá una bonificación mínima de $900 por cada año de servicio, hasta un máximo de $27,000 de bonificación. Señaló la legislatura que para ello se separaron $50 millones provenientes de la transacción del arrendamiento del aeropuerto Luis Muñoz Marín. Tal medida es contradictoria a lo enunciado en la Exposición de Motivos de la Ley 3.

 Véase la propia Exposición de Motivos de la Ley Núm. 3, supra; Ley Núm. 524-2004, Ley Núm. 144-2005, Ley Núm. 35-2007.

 «ipjjg potential impact of increasing the cap on personal loans from $5,000 to $15,000 on the System’s liquidity profile and investment portfolio should have been thoroughly vetted before the ERS [(Sistema de Retiro de Empleados) decided to amend the regulations pertaining to personal loans. Based on our review of the relevant documentation that was provided to us, including the 2007 ERS Board of Trustee minutes, and interviews with various key employees of the ERS, it appears that such due care was not used by the System Administrator in supporting this change or by the Board of Trustees in approving this change [...] Approving such a decision without supporting analyses demonstrates lack of fiduciary responsibility by ERS management and the Board of Trustees”. CT-13-06, Apéndice I, pág. 17.

 íd., pág. 10.

 íd.

 Concretamente el estudio expresa lo siguiente:
“[...] Given the dramatic increase in the funding ratio presented to them, ERS [(el Sistema de Retiro)] management, the Board of Trustees and GDB [(Banco Gubernamental de Fomento)] Board of Directors had a responsibility to fully understand if the increase was reasonable and calculated consistently with prior period calculations. This lack of understanding falls short of what is expected from a director or a fiscal agent that is exercising prudence or acting within the general standards of reasonability”. Id., pág. 12.

 íd., pág. 15.

 “The POB transaction has negatively impacted the ERS and the Government, in general. Rather than addressing the System’s long-term funding problems, the POB transaction merely provided a short-term temporary measure to address the System’s liquidity needs. This short-term measure is pricey and its cost may be realized for decades to come. In our opinion, the POB transaction accomplished little more than passing on, and increasing the complexity of, the burden of fixing the System’s fundamental structural problems to future administrations of the ERS. We also believe that certain actions and omissions of the Board of Trustees, GDB Board of Directors and ERS management during the POB decision making process were not reasonable and potentially flawed. As such, Conway MacKenzie recommends that further investigation into the POB decision-making process should be pursued by the appropriate authorities”. Id., págs. 16-17.

 Nótese que el Estado evade una responsabilidad previamente contraída con la Administración de los Sistemas de Retiro. Y así, a raíz de esa negligencia, intenta remediar el problema menoscabando los derechos adquiridos de los pensionados futuros. Véase U.S. Trust Co. of New York v. New Jersey, supra.

 Cabe señalar que la propia Exposición de Motivos de la Ley Núm. 7-2009 establece que el Gobernador de Puerto Rico había tomado medidas para atender esta grave situación y que mediante las Órdenes Ejecutivas OE-2009-001 y OE-2009-004, había establecido medidas inmediatas de control de gastos incluyendo: la congelación de puestos vacantes; la prohibición a la creación de nuevos puestos; la eliminación de un 30% de los puestos de confianza en las agencias; la reducción de gastos operacionales equivalente al 10% de la mitad de los gastos operacionales presupuestados para el año fiscal 2008-2009; la prohibición del uso de tarjetas de crédito; la limita *887 ción al uso de vehículos oficiales, y la prohibición del uso de fondos públicos para sufragar gastos relacionados al uso de celulares, entre otras medidas.

 Sobre este particular expresamos que “ninguna ley al momento le reconoce al empleado público un derecho sin limitaciones a la retención, o un derecho a no ser cesanteado”. Domínguez Castro et al. v. E.L.A. I, supra, pág. 69.

 Sin embargo, es posible que una acción estatal que no viola la cláusula contra el menoscabo de las relaciones contractuales —ya que esta acción estatal es razonable y necesaria para servir un interés público— viole la cláusula contra la expropiación sin justa compensación o taking. Esto así, ya que cuando el Estado toma propiedad privada, es irrelevante si lo hace con un fin importante, por ende, cuando expropia este debe pagar una justa compensación. J.M. Beermann, The Public Pension Crisis, 70 Wash. & Lee L. Rev. 3, 63-64 (2013).

 Nótese que en la Exposición de Motivos de la Ley 3, supra, el legislador plasmó que “[e]l bienestar de todos los que vivimos en Puerto Rico se vería seriamente afectado si más recursos del Fondo General se compromete para pagar las pensiones de los pensionados”. También indicó que “[m]ás fondos para los Sistemas de Retiro implican menos fondos para educar a nuestros niños, proteger nuestros hogares, cuidar nuestra salud y mejorar la infraestructura que utilizamos todos los días”. El impacto económico que sufrirán los empleados retirados no tiene precedente. Las expresiones que acabamos de transcribir no contiene ápice de razonabilidad alguna y no ha sido objeto de prueba para ser aquilatado por un tribunal.

 Domínguez Castro et al. v. E.L.A. I, supra, pág. 118, opinión disidente de la Jueza Asociada Señora Fiol Matta.

 íd.

 íd., pág. 115.

 íd., pág. 111.

 íd., pág. 114.

 íd., pág. 114.

 Alvarado Pacheco y otros v. ELA, 188 DPR 594, 643 (2013), voto particular del Juez Asociado Señor Rivera García.

 L. Fiol Matta, J., Knowing the communities we serve, 49 Court Review, 13, 2013. Disponible en: http://aja.ncse.dni.us/publications/courtrv/cr49-l/CR49-lMatta.pdf (última visita, 24 de junio de 2013).

 íd., pág. 19.